ORDERED in the Southern District of Florida on *November 16, 2006*



_____
John K. Olson, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

In re:

DENIS CHIRA,

                    Debtor.
_____/

SONYA L. SALKIN, TRUSTEE,

                    Plaintiff,

vs.

ELIZABETH CHIRA, et al.,

                    Defendants.
_____/

Case No. 05-22074-BKC-JKO

Chapter 7

Adv. Proc. No. 06-1264-BKC-JKO-A

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND MEMORANDUM OPINION**

This case presents the tragic and unedifying spectacle of an ex-husband and ex-wife wasting

huge portions of the equity in their only significant marital asset, a beachfront hotel, in a decade-long

1

litigation grudge match which has enriched a few lawyers but brought no joy or satisfaction to any one. The ex-husband, an involuntary debtor, was characterized by the trustee's counsel as abusive; the ex-wife, as vindictive. Both characterizations hit the mark.

On August 22, 23, and 24, 2006, I held trial on the issues pending between the plaintiff, Sonya L. Salkin (the "Trustee"), as trustee for the ex-husband, Denis Chira ("Denis" or the "Debtor"), and three of original eight defendants, the ex-wife Elizabeth Chira[1] ("Elizabeth"), Eliezer Botton, and Sheldon Hotel Lounge Corp. Having considered the written and oral testimony of the witnesses, the exhibits admitted into evidence, the stipulations contained in the court's pretrial order (CP 104), and the legal arguments made by counsel for the parties, the court makes the following findings of fact and conclusions of law:

## Procedural posture

The Debtor's case began with the filing of an involuntary petition in April 2005.[2] The order for relief under chapter 7 was entered without objection on June 20, 2005. The plaintiff Trustee began serving as interim trustee during the involuntary case on May 31, 2005.[3]

The Trustee commenced this adversary proceeding in March 2006 to determine the validity, priority, and amount of those deeds made and obligations incurred by the Debtor. The Trustee also sought to obtain determinations of many collateral issues involving mortgagees, lienholders, co-owners, and an insider lessee, that affect the Trustee's ability to liquidate the estate. The eight defendants in this adversary proceeding are those who claim an interest in real property in Hollywood, Florida.

---

[1] As discussed below, Elizabeth is Denis' first ex-wife.
 [2] Pretrial Order ¶3.
 [3] Pretrial Order ¶4; Direct Testimony of Denis Chira ¶2.

2

In a series of partial judgments entered in this case, the interests of five defendants have been resolved,[4] leaving just Elizabeth Chira, Eliezer Botton, and Sheldon Hotel Lounge Corp. in litigation with the plaintiff.[5]

The remaining issues may be stated, somewhat simplistically, as: (1) What are Elizabeth's interests in the Property and her claims against Denis, and should any of those claims be subordinated because of inequitable conduct? (2) What are first mortgage holder Eliezer Botton's secured claims against the estate, and should any of those claims be subordinated? (3) Should the lease held by Sheldon Hotel Lounge Corp. ("Lounge Corp."), be disregarded as a sham?

### Findings of fact

Most of the facts, many of them developed through years of litigation in state court prior to the commencement of this case, are stipulated by the parties. Others are the subject of unrebutted testimony of either Denis Chira or Elizabeth Chira. Where the court has adopted one or another's party's version of disputed events, it does so based on observation of the demeanor of the witnesses and consideration of all conflicting evidence.[6]

---

[4] The issues already resolved by summary judgments or settlements include: whether Denis Chira's second ex-wife, Tiffany Lane Walker holds any valid, enforceable, and unavoidable interest in the hotel; whether either Nofal Kahook or Sheldon Beach Resorts, Inc. holds any valid, enforceable, and unavoidable interest in the hotel or in Lounge Corp.; which of First Trust Corp.'s numerous state court judgments should govern the principal amount of its secured claim, and at what rate should interest accrue; what interest rate and how much attorney's fees have accrued upon Barry G. Roderman & Associates, P.A.'s judgments; whether those judgment are subject to being set aside as collusive or fraudulent; and whether Superior Moving, Inc.'s judgment is avoidable.

[5] Marika Tolz, chapter 7 Trustee for Tiffany Lane Walker, whose 2003 bankruptcy case was recently reopened, has moved to intervene in this proceeding. The plaintiff-Trustee did not oppose the intervention. For that reason it is possible that the interest of yet another defendant, Ms. Tolz, must still be resolved.

[6] Because Denis Chira has two ex-wives who are parties to this adversary proceeding, I refer to most of the parties by their first names.

The Debtor, Denis Chira, was married to the defendant Elizabeth Chira from October 29, 1970 to 1999.[7] They had two daughters. Denis was sometimes an abusive husband.[8]

At one time, Denis and Elizabeth were joint owners of real property located in Hollywood, Florida and more particularly described as:

> Lots 1, 2, 3, 4, 7, 8, 9 and the east 30 feet of Lot 10, Lots 23 and 24, Block 1, Hollywood Beach subdivision as recorded in Plat Book 1, page 27, of the Public Records of Broward County, Florida

The property consists of a 40-room hotel with first-floor retail space ("the Sheldon Beach Hotel") on four oceanfront lots, and several parking lots which are contiguous to each other but not to the oceanfront lots (collectively, "the hotel" or "the Property").[9]

Denis and Elizabeth acquired the Property by a warranty deed dated September 28, 1978 (recorded at Official Records Book 7794, page 998, Public Records of Broward County),[10] an undated quitclaim deed recorded on October 2, 1978 (recorded at OR 7794/998),[11] and a corrective warranty deed dated November 20, 1978 (recorded at OR 7909/368).[12]

For many years, Denis and Elizabeth operated the Sheldon Beach Hotel, and at various times they operated a nightclub and other stores in the retail space facing the ocean on the first floor of the hotel.[13]

---

[7] Pretrial Order ¶5.
[8] Direct Testimony of Elizabeth Chira ¶6.
[9] Pretrial Order ¶13; Direct Testimony of Sonya L. Salkin ¶2.
[10] Exhibit 1, Warranty Deed; Pretrial Order ¶14.
[11] Exhibit 2, Quit Claim Deed; Pretrial Order ¶14.
[12] Exhibit 3, Corrective Warranty Deed; Pretrial Order ¶14.
[13] Pretrial Order ¶15.

At the time of his divorce from Elizabeth, Denis owned an undivided one-half interest in the Property[14] and Elizabeth owned the other half.[15] Denis worked as a used car salesman after the divorce, and failed to pay most of his child support obligations under the 1999 divorce agreement.[16]

The defendant Eliezer Botton ("Eliezer") is Elizabeth's brother.[17]

The defendant Sheldon Hotel Lounge Corp. ("Lounge Corp.") is a Florida corporation.[18] Denis and Elizabeth incorporated Sheldon Hotel Lounge Corp. ("Lounge Corp.") in 1978.[19] At least through January 2005, they each owned 50% of the issued and outstanding common stock.[20]

Through the years, Denis and Elizabeth (i) deposited the hotel rents and receipts, the Sheldon Beach Hotel's retail rents, and receipts from their nightclub, into Lounge Corp., (ii) paid the operating expenses of the Sheldon Beach Hotel and the nightclub from Lounge Corp., and (iii) drew from Lounge Corp. such compensation, advances, or capital distributions as Lounge Corp. could afford to pay them.[21] After the nightclub closed, they rented out the nightclub space to a series of tenants, and deposited those rents into Lounge Corp. as well.[22]

Around 1989, Denis and Elizabeth separated and Elizabeth received a *ghet* under Jewish law, but they were not divorced in civil court.[23] They later reconciled and were remarried under Jewish law.[24] As a result of the problems in their marriage, they entered into a Post-Nuptial Property Settlement Agreement ("the 1993 Post-Nuptial Agreement") on November 16, 1993.[25] One of the

---

[14] Pretrial Order ¶20.
[15] Direct Testimony of Denis Chira ¶2.
[16] Direct Testimony of Denis Chira ¶5.
[17] Pretrial Order ¶9.
[18] Pretrial Order ¶12.
[19] Pretrial Order ¶16.
[20] *Id.*
[21] Pretrial Order ¶17.
[22] *Id.*
[23] Pretrial Order ¶18.
[24] *Id.*
[25] *Id.*

provisions in this agreement was that neither party could alienate his or her interest in the Property without the prior written consent of the other party.[26] At the time, the Property was unencumbered by any liens.[27]

On September 23, 1993, the Chiras gave their promissory note in the amount of $550,000, and a first mortgage on the Property securing the note, to Family Bank.[28] The mortgage was recorded at OR 21190/188.[29] Family Bank later was merged into Republic Security Bank, which assigned the instruments to Transcapital Bank.[30] The assignment was recorded on June 16, 2000 at OR 30616, page 664.[31] As discussed below, this mortgage is now owned by Eliezer.[32]

On December 9, 1996, Denis and Elizabeth conveyed the Property from a tenancy by the entireties into a tenancy-in-common, each party owning an undivided fifty percent interest.[33] The deed is recorded at OR 25802/0024.[34] At all times since, Elizabeth has owned an undivided 50% interest in the Property, as tenant in common, and her interest is encumbered only by the 1993 Family Bank mortgage which is now owned by Eliezer.[35]

The Chiras separated in October 1998, and Elizabeth commenced a divorce proceeding in the circuit court in Broward County on February 2, 1999 (Case No. 99-1592(41/91)).[36] They entered into a Mediation Agreement on May 14, 1999, which ratified the 1993 post-nuptial agreement except

---

[26] *Id.*
[27] *Id.*
[28] Pretrial Order ¶19; Exhibit 189, Florida Real Estate Mortgage and Security Agreement.
[29] *Id.*
[30] Pretrial Order ¶19; Exhibit 190, Assignment of Family Bank Mortgage to Transcapital.
[31] *Id.*
[32] Pretrial Order ¶19.
[33] Pretrial Order ¶20; Exhibit 6, Warranty Deed (from Denis and Elizabeth as TBE into tenancy-in-common).
[34] Pretrial Order ¶20.
[35] *Id.*
[36] Pretrial Order ¶21.

as provided in the 1999 mediation agreement.[37]    The 1999 agreement was attached to and incorporated into an October 13, 2000 Agreed Order Ratifying, Confirming and Approving Mediation Settlement Agreement, recorded at OR 30967, page 1704 on October 27, 2000.[38]

Both the 1993 Post-Nuptial Agreement and the May 14, 1999 Mediation Agreement were referred to and incorporated in the final judgment of divorce entered on June 17, 1999.[39] The final judgment is recorded at OR 29635/1645.[40] The judgment provided, among other things, that Denis and Elizabeth would continue to own the Property as joint owners.[41]

In June, 1999, Denis and Elizabeth entered into a Business Lease of the Property with Lounge Corp., the term of which runs until May 31, 2014.

Denis was married to Tiffany Chira from 1999 to 2003,[42] but Denis and Tiffany were separated on several occasions for months at a time. Denis was arrested twice for spousal abuse. They had no children.

On June 2, 2000, Denis executed and delivered to City First Mortgage Corp. a promissory note in the amount of $425,000 and a Mortgage and Security Agreement on his 50% interest in the Property.[43]  This encumbrance clearly violated the 1993 Post-Nuptial Agreement and the final judgment in Denis and Elizabeth's divorce, both of which were matters of public record.  The mortgage was recorded on July 10, 2000 at OR 30655/1553.[44] On November 14, 2000, Denis drew an additional $150,000 loan from City First, although City First retained some of that amount for

---

[37] Pretrial Order ¶21; Exhibit 7, Mediation Agreement.
[38] Pretrial Order ¶21; Exhibit 22, Agreed Order.
[39] Pretrial Order ¶22; Exhibit 8, Final Judgment of Dissolution of Marriage.
[40] Id.
[41] Id.
[42] Pretrial Order ¶6.
[43] Pretrial Order ¶26; Exhibit 14, City First Mortgage and Security Agreement; Exhibit 186, City First Promissory Note, $425,000.
[44] Id.

7

fees and expenses.[45]  On that date, Denis executed and delivered to City First Mortgage Corp. an

Advance Note in the amount of $150,000,[46] a Consolidated Modified Note in the amount of

$573,473.26,[47] and a Mortgage Modification Agreement.[48]

City First Mortgage Corp. assigned the instruments described in the preceding two

paragraphs to First Trust and other assignees on or about December 12, 2000 (OR 31155/1708),[49]

and these "other assignees" further assigned their interests to First Trust (OR 31098/1625-1629 and

OR 31249/710).[50]  Denis spent the proceeds of the City First loans on household expenses and the

lifestyle which he and Tiffany shared.[51]

On September 22, 2000, Denis and Elizabeth reached another mediated agreement, approved

by the divorce court on October 13, 2000.[52]  Among its provisions was an agreement in principle to

sell the Property jointly to anyone for $4,750,000.[53]  This September 2000 agreement was recorded

on October 27, 2000 as an exhibit to the order approving it.[54]  OR 30967/1704.

On December 18, 2000, Transcapital Bank commenced a foreclosure action, Case No. 00-

021423 (25) (17th Judicial Circuit, Broward County), against the Property, and recorded a Notice

of Lis Pendens (OR 31148/0051).[55]  It voluntarily dismissed the action on January 12, 2001 (OR

31232/1462).[56]

---

[45] Pretrial Order ¶27; Exhibits 16, City First Advance Note; Exhibit 17, City First Consolidated Modified
Note, and Exhibit 18, City First Mortgage Modification Agreement.
[46] Id.; Exhibit 16, City First Advance Note.
[47] Id.; Exhibit 17, City First Consolidated Modified Note.
[48] Pretrial Order ¶27; City First Mortgage Modification Agreement
[49] Pretrial Order ¶28; Exhibit 19, Assignment of Mortgage to First Trust.
[50] Pretrial Order ¶28; Exhibit 21, Assignment of Mortgage, dated 1/29/01, to First Trust
[51] Pretrial Order ¶29.
[52] Pretrial Order ¶30; Exhibit 187, Mediation Agreement.
[53] Id.
[54] Id.
[55] Pretrial Order ¶31; Exhibit 23, Notice of Lis Pendens.
[56] Pretrial Order ¶31; Exhibit 24, Notice of Voluntary Dismissal.

On January 5, 2001, Denis and Elizabeth signed yet another mediated agreement, by which Elizabeth would be given a limited time to buy Denis' interest in the Property for $1,670,000, absent which Denis could find a buyer for the entire property so long as Elizabeth would receive at least $1,670,000 for her interest.[57]  The divorce court, in approving the agreement, further directed that Elizabeth be given the right to set off against her purchase price the amount Denis owed to her, and directed the task of calculating the setoff to a special master.[58]

Ultimately, special master Jerrold Knee issued a Special Master's Report and Recommendations dated July 22, 2003, recommending a setoff in favor of Elizabeth in the amount of $85,377.58.[59]  Elizabeth filed exceptions to the master's recommendations.[60]  It does not appear from the record whether the divorce court ever finally determined the setoff amount.

On or around July 22, 2001, Denis entered the Sheldon Beach Hotel, and began removing records.[61]  A dispute between Denis and Elizabeth erupted over possession, and the hotel operation closed.[62]

In the summer of 2001, four of five retail spaces were occupied: the two northernmost bays by Elizabeth's company, Swim & Fun Wear, Inc. d/b/a Swim & Fun Wear, which did not pay rent; the adjacent two bays by a restaurant tenant, Pinasse, Inc. d/b/a Chez Andre's, which struggled during the off-season to pay its rent; the next bay by Denis' company, Bikers Nest of Hollywood, Inc., which did not pay rent; and the southernmost two bays by Distinctive USA, Inc.[63]

On July 26, 2001, First Trust filed a suit in circuit court (Case No. 01-13030 (11), (17th

---

[57] Pretrial Order ¶32; Exhibit 126, Mediation Agreement.
[58] Pretrial Order ¶32.
[59] Pretrial Order ¶33; Exhibit 25, Special Master's Report and Recommendations.
[60] Exhibit 157, docket for Case No. FMCE 99-001529, Elizabeth Chira v. Denis Chira.
[61] Pretrial Order ¶34.
[62] *Id.*
[63] Pretrial Order ¶35.

Judicial Circuit, Broward County) seeking foreclosure of its mortgage, and alleging that Denis was in default of making all payments due since July 1, 2001.[64] The *lis pendens* was recorded at 31935/628.[65] In First Trust's suit, Elizabeth cross-claimed against Denis for damages.[66]

On August 30, 2001, Elizabeth filed an emergency motion in the divorce court seeking the appointment of a receiver, but the court deferred ruling and ordered the parties to attend mediation.[67] Upon Elizabeth's renewed motion to appoint a receiver, filed October 19, 2001, which alleged misconduct by Denis, the divorce court on October 25, 2001, entered an order appointing Dean Liotta ("the Receiver") as receiver for the Sheldon Beach Hotel and for Lounge Corp.[68] The order directed Denis to turn over possession to the Receiver and to not interfere with the Receiver.[69]

Notwithstanding the entry of the October 25 order, Denis collected the November rent in the amount of $4,635 from retail tenant Distinctive USA, Inc. on or about October 30.[70]

On November 21, 2001, the divorce court entered a further order clarifying that it was the court's intention that neither Denis nor Elizabeth could deal in any way with the Property or their interests in the Property, and staying the effect of Denis' conveyance of his interest to SBRI.[71]

On October 22, 2001, Transcapital Bank executed and delivered to Elizabeth's brother, Eliezer Botton, an Assignment of Mortgage, Note and Loan Documents, which was recorded on December 6, 2001 at OR 32443/1694.[72] This instrument assigns Transcapital's first mortgage

---

[64] Pretrial Order ¶36.
[65] Pretrial Order ¶36; Exhibit 191, First Trust's Notice of *Lis Pendens*.
[66] Pretrial Order ¶36.
[67] Pretrial Order ¶37.
[68] Pretrial Order ¶42; Exhibit 31, Order on Renewed Emergency Motion for the Appointment of Receiver.
[69] *Id.*
[70] Pretrial Order ¶43.
[71] Pretrial Order ¶44; Exhibit 74, Order Granting Receiver's Motion for Clarification.
[72] Pretrial Order ¶45; Exhibit 32, Assignment of Mortgage, Note and Loan Documents.

interest in the Property to Eliezer.[73]   At the time, the balance due to Transcapital was roughly $475,000, and Elizabeth had made the last three payments made on the mortgage, on July 16, 2001 ($3,150.00), August 2, 2001 ($1,506.17), and September 6, 2001 ($2,935.00).[74]

Elizabeth had mortgaged her home for $525,000 on October 17, 2001.[75]   From these funds, she provided to Eliezer, styled as a loan, the funds he used to purchase Transcapital's first mortgage on the Property.[76]

The Receiver took control of the Sheldon Beach Hotel and the bank account of Lounge Corp.[77]   The Receiver deposited receipts only into Lounge Corp., and paid all expenses from Lounge Corp.[78]   He operated the hotel for two-and-one-half years, using the same accountant whom Elizabeth and Denis had used.[79]

Among other things, the Receiver (i) filed at least one income tax return for Lounge Corp.; (ii) made at least one lease modification with retail tenant Pinasse, Inc. (approved by the court on May 2, 2002, OR 33151/1432); (iii) litigated a third party action against Elizabeth's Swim & Fun Wear from its retail space, which resulted in its eviction; (iv) litigated a third party action against Joe's Ocean Market, which resulted in a judgment canceling those leases (OR 36292/1628); (v) acted to prevent Nofal Kahook of SBRI from interfering with the Receiver's relationship with its retail tenants; (vi) made repairs; (vii) resolved a lawsuit (Case No. 02-007108, 17th Judicial Circuit, Broward County) brought by the City of Hollywood to enforce special assessment liens; (viii) filed

---

[73] *Id.*
[74] Pretrial Order ¶45.
[75] Pretrial Order ¶46.
[76] *Id.*
[77] Pretrial Order ¶47.
[78] *Id.*
[79] *Id.*

fee applications; and (ix) paid court-approved fees to himself and his counsel, Jeff Sarrow.[80]
Whenever court action was necessary, the Receiver took the action in the divorce/receivership case.[81]

During the Receivership, the Receiver solicited and received substantial funds from Eliezer.[82]
Eliezer advanced funds that were used to either pay (i) expenses of the Property; (ii) Receiver's fees;
(iii) Receiver's attorney fees; and (iv) real estate taxes due on the Property.[83]  The advances by
Eliezer totaled $613,848.93, as follows:

| | | |
|---|---:|---|
| November 2001 | $ 10,000.00 | to Dean Liotta |
| November 2001 | 4,000.00 | to Dean Liotta |
| December 2001 | 3,000.00 | to Dean Liotta |
| December 2001 | 5,000.00 | to Sheldon Hotel Lounge Corp. |
| Unknown dates | 21,000.00 | to Sheldon Hotel Lounge Corp. |
| January 2005 | 375,000.00 | to Jeffrey Sarrow Trust Account |
| April-May 2005 | 107,531.38 | to Broward County Revenue Collection Division: folio #7100 (2000-2002) |
| April-May 2005 | 35,315.40 | to Broward County Revenue Collection Division : folio #7100 (2003) |
| April-May 2005 | 21,988.98 | to Broward County Revenue Collection Division: folio #7500 (2000-2002) |
| April-May 2005 | 9,748.14 | to Broward County Revenue Collection Division: folio #7500 (2003) |
| April-May 2005 | 8,120.98 | to Broward County Revenue Collection Division: folio #8400 (2000-2002) |
| April-May 2005 | 3,251.94 | to Broward County Revenue Collection Division: folio #8400 (2003) |
| April-May 2005 | 6,905.75 | to Broward County Revenue Collection Division: folio #8500 (2000-2002) |
| April-May 2005 | 2,986.36 | to Broward County Revenue Collection Division: folio #8500 (2003)[84] |
| | **$613,848.93** | |

---

[80] Pretrial Order ¶48.

[81] *Id.*

[82] Pretrial Order ¶49.

[83] *Id.*

[84] *Id.*

In addition to these, Eliezer made two other payments of real estate taxes, in the amounts of $2,986 and $180, so that the total advanced by Eliezer on receivership expenses is $617,015.[85]

At no time did Eliezer, or the receiver, or anyone else, obtain for Eliezer either a court-approved receiver's certificate or specific court approval for Eliezer to be repaid these monies.[86] However, the state court acknowledged that Eliezer advanced funds to the receivership in order to resolve some of the more immediate problems.[87]

On one occasion, Elizabeth appealed from orders, dated April 25, 2003, awarding fees to the Receiver and the Receiver's counsel (Appeal No. 4D03-1889).[88] The state court of appeal affirmed those orders on July 14, 2004,[89] and issued its mandate on July 30, 2004 (recorded at OR 37962/1677).[90]

On November 27, 2002, Denis consented to the entry of a $2,500,000 money judgment in favor of Elizabeth upon her crossclaim in the First Trust foreclosure case which had been commenced in July 2001.[91]    At the same time they exchanged a Mutual General Release dated November 27, 2002.[92] A certified copy of the judgment was recorded on November 27, 2002 at OR 34171/656.[93] As discussed below, this judgment was later vacated.[94]

---

[85] Direct Testimony of Sonya L. Salkin ¶3(b).
[86] Pretrial Order ¶50.
[87] *Id.*
[88] Pretrial Order ¶51.
[89] 876 So. 2d 1212 (Fla. 4th DCA 2004).
[90] Pretrial Order ¶51; Exhibit 33, Mandate from District Court of Appeal of the State of Florida Fourth District.
[91] Pretrial Order ¶52.
[92] *Id.*
[93] *Id.*
[94] *Id.*

On August 28, 2003, the divorce court entered a Memorandum Order directing the Receiver to seek out a buyer for the Property, and detailing conduct by Elizabeth and Denis that led the court to conclude that the Property should be sold with or without their cooperation.[95]

Elizabeth appealed the August 28 order to the state court of appeal (Appeal No. 4D03-3785).[96] A copy of the notice of appeal, with the August 28 order attached, is recorded at OR 36147/148).[97]

Meanwhile, pursuant to authority from the divorce court, the Receiver entered into negotiations with José Saal, acting as a nominee for an undisclosed purchaser, and Mr. Saal presented an offer of $5,850,000 with $100,000 deposit.[98] Mr. Saal's Agreement for Purchase and Sale was accepted by the Receiver's signature to an Addendum on October 9, 2003, subject to court approval.[99]

The Receiver's October 17, 2003 motion to approve the proposed sale to Saal was first heard by the divorce court in November, and again on December 2, and again on December 23, but each time the court's determination of the motion was postponed at the request of Elizabeth, so that she could conduct discovery.[100] She did not conduct any discovery prior to December 23.[101]

After a fourth hearing, on January 8, 2004, the divorce court on January 12 entered its Order Granting Receiver's Motion for Authorization to Accept Purchase Offer and Sell Assets of Receivership Estate. However, because Elizabeth's appeal from the court's August 28, 2003 sale

---

[95] Pretrial Order ¶59.
[96] Pretrial Order ¶60.
[97] *Id.*
[98] Pretrial Order ¶61.
[99] *Id.*
[100] Pretrial Order ¶62.
[101] *Id.*

procedures order was still pending, the court deferred the effectiveness of the January 12, 2004 order until the appeal of the August 28, 2003 order was completed.[102]

During the receivership, the Receiver and others took actions to attack certain transactions which clouded the title to the Property. SBRI was permitted to intervene in the First Trust foreclosure action on March 20, 2002.[103] In that case, it objected to the $2.5 million consent judgment given by Denis to Elizabeth.[104] The court in the First Trust foreclosure case vacated the consent judgment by entering its Order on Motion to Vacate Fraudulent Consent Judgment on June 19, 2003 (recorded at OR 35452/693), but reserved jurisdiction so that "Ms. Chira may seek an evidentiary hearing regarding the judgment."[105]

The state court of appeal issued a *per curiam* affirmance of the August 28, 2003 sale procedures order on November 24, 2004, and issued its mandate on December 10 (OR 38726/355).[106]

On January 3, 2005, general magistrate Alan R. Marks issued a Report to the divorce court on the subject of debts owed by Denis to Elizabeth.[107] Denis filed no objection to the report, and the court ratified and approved the report by order dated January 21, 2005.[108] The magistrate found that Denis owed Elizabeth $133,809.95 for child support and related matters and $206,370.00 in attorneys' fees and costs incurred in the pursuit of child support.[109] Interest accrued through April 14, 2005 at 7% interest added another $11,545.71.[110] Child support and health insurance for the time

---

[102] Pretrial Order ¶63.

[103] Pretrial Order ¶64(c).

[104] *Id.*

[105] *Id.*; Exhibit 46, Order on Motion to Vacate Fraudulent Consent Judgment.

[106] Pretrial Order ¶73; Exhibit 63, Mandate from District Court of Appeal of the State of Florida Fourth District.

[107] Pretrial Order ¶74; Exhibit 64, Report of General Magistrate and Notice of Filing and Certificate of Service.

[108] Pretrial Order ¶74.

[109] Pretrial Order ¶74.; Exhibit 64, Report of General Magistrate and Notice of Filing and Certificate of Service

[110] Direct Testimony of Elizabeth Chira ¶48(a),(c).

period between the date of the general magistrate's hearing and April 14, 2005, applying the same findings made by magistrate Marks, comprise another $8,334.00.[111] Accordingly, the total of Elizabeth's child support claim is **$360,059.66**, and Elizabeth's child support claim will be allowed as a priority claim in that amount.

The January 3, 2005 magistrate's report also found that Denis owed Elizabeth $258,091.98 as equitable distribution and related expenses.[112] However, this total includes $129,000 in salary,[113] which Elizabeth concedes she later drew from the hotel revenues,[114] so a balance of $129,081.98 was owing. Interest has accrued on this sum at 7% from October 19, 2004 through April 14, 2005, totaling $4,381.71, and Elizabeth's equitable distribution claim will be allowed in the aggregate amount of **$133,463.69**.

The magistrate's report further recommended that certain insurance proceeds taken from the hotel by Denis be charged against him if he did not furnish proof, within 30 days after entry of the order approving the recommendations, that he spent the monies on the hotel.[115] He did not furnish the proof, although he had made a settlement agreement with Elizabeth and obtained the divorce court's approval of the settlement before the 30 days expired.[116]

He and Elizabeth had previously agreed that he owed her $33,800 for her share of the roughly $80,000 in insurance proceeds that from insurance checks sometime in 1999 or 2000,[117] and this court accepts that this is the sum that Denis owed to Elizabeth, together with interest through the

---

[111] Direct Testimony of Elizabeth Chira ¶48(b).
[112] Exhibit 64, ¶2(b).
[113] Exhibit 64, ¶1(n).
[114] Trial Trans. 8/23/06, p. 319–20; Exhibit 197, Elizabeth Chira's Explanation of "Diversions."
[115] Exhibit 64, Report of General Magistrate, ¶1(c).
[116] Pretrial Order ¶75.
[117] Exhibit 126, 2001 Mediation Agreement. Elizabeth's figure of $38,000 in ¶48(e) of her Direct Testimony, is not supported by Exhibit 126.

16

petition date in the amount claimed by Elizabeth and acknowledged as due by the Trustee, $11,978, for an aggregate claim by Elizabeth for insurance proceeds in the amount of **$44,978.**

Finally, the magistrate's report recommended that $129,620 which Denis collected in rents and security deposit from Distinctive USA be charged against Denis if he did not furnish proof, within 30 days after entry of the order approving the recommendations, that he had spent them on the hotel.[118] He did not furnish the proof, although he had made a settlement agreement with Elizabeth and obtained the divorce court's approval of the settlement before the 30 days expired.[119] Denis would have been entitled to one-half of this sum in any event, but he and Elizabeth had made a written agreement in December 1999, at the time of his lease to Distinctive USA, that he could lease out the south corner space "for his sole benefit" and that Elizabeth could have a double bay on the north corner of the building, for her sole benefit.[120] Elizabeth chose to open her own store, Swim & Fun Wear, in two other bays but later moved the store into her new space on the north corner. Denis owes nothing to Elizabeth on this account.

The magistrate's report deferred the issue of Elizabeth's entitlement to recover for her exposure to the Receiver's and Receiver's counsel's fees. Eliezer Botton later paid $375,000 to satisfy those claims by the Receiver and his counsel, and has charged the Property for the $375,000 plus interest. There has been no adjudication by the divorce court on whether Elizabeth is entitled to the $187,500 which she claims as a part of her nonpriority claim. Because Eliezer claims the advance as part of his first mortgage lien, thereby encumbering both the estate's interest in the Property and Elizabeth's, the Court does not accept this portion of Elizabeth's claim as allowable

---

[118] Exhibit 64, Report of General Magistrate, ¶1(m).
[119] Pretrial Order ¶75.
[120] Exhibit 185, Letter agreement between Denis and Elizabeth.

17

as a separate claim against Denis. It is apparent from a review of the divorce court docket[121] and the various state court orders in this trial record[122] that at least as much of the Receiver's and his counsel's efforts were devoted to dealing with Elizabeth's misconduct and her unsuccessful opposition to many of the Receiver's actions. In light of the fact that Elizabeth both sought the appointment of the Receiver and litigated vigorously with him, it would be inequitable to attribute more than half of the Receiver's fees and costs to the Denis' estate.

Consequently, the total amount of Elizabeth's nonpriority claim is **$178,441.69** ($133,463.69 + $44,978.00).

On January 28, 2005, Denis, Elizabeth, SBRI and Kahook entered into a Joint Stipulation for Global Settlement Agreement (the "January 2005 settlement agreement").[123] Upon the motions of Denis, Elizabeth and SBRI/Kahook, it was approved in the SBRI suit (Case No. 03 16309 (02)) on February 10, 2005, in the divorce case (Case No. 99-15299 (41/91)) on February 24, 2005, and in the First Trust case (Case No. 01-13030(12)) on March 3, 2005.[124]

Upon the joint request of Denis and Elizabeth, the divorce court discharged the Receiver effective March 1, 2005, finding that there was no reason for the receivership to continue.[125] On March 3, 2005, the divorce court stayed the sale closing date for 15 days from March 10, 2005.[126] On February 1, 2005, Elizabeth filed a motion to set aside the sale, on the basis that the Receiver had

---

[121] Exhibit 157, Docket.
[122] *See especially,* Exhibit 42, Memorandum Order.
[123] Pretrial Order ¶75; Exhibit 65, Joint Stipulation for Global Settlement Agreement.
[124] Pretrial Order ¶75.
[125] Pretrial Order ¶76. In light of the subsequent litigation here over whether the sale contract survived the discharge of the Receiver, *see In re Chira,* 343 B.R. 361(Bankr. S.D. Fla. 2006), this decision appears to have been improvident.
[126] Pretrial Order ¶76.

18

been discharged.[127]  The divorce court denied the motion on May 3, 2005.  Elizabeth appealed, and that appeal is pending in the state court of appeal.[128]

On March 2, 2005, Mr. Saal filed motions (a) to reappoint the Receiver for the sole purpose of effectuating the closing of the Saal sale and (b) to treat the Lounge Corp. lease as having been included in the Saal sale or to void the lease.[129]  The divorce court denied the motions on April 8, 2005.[130]  Saal appealed, but the court of appeal dismissed those appeals for lack of jurisdiction.[131]

Elizabeth did not control the Property, including its hotel operations and revenues, and records thereof, during the term of the receivership, from October 2001 through March 2005.[132]  The Receiver turned over possession to her on or about March 10, 2005, and Elizabeth has operated the hotel since that time.

In her Direct Testimony, Elizabeth described $155,000 that she drew from the hotel in back salary for the period 1999 to 2001 in 2005.[133]  In an accounting which she brought to the trial, she disclosed an additional $69,702 in "salary catch-up" which she drew in April 2006.[134]  The accounting reflects that she drew $155,000 at a time when she was owed, at most, $135,000 in back salary, and so she paid herself three months future salary.  The $155,000 was not reported as salary on a form W-2 at the end of the year because Elizabeth chose to treat it as Form 1099 compensation rather than salary.[135]

---

[127] Pretrial Order ¶77.
[128] Pretrial Order ¶77.  There is no indication in the record as to what has become of that appeal.
[129] Pretrial Order ¶78.
[130] Pretrial Order ¶78.
[131] Pretrial Order ¶78.
[132] Pretrial Order ¶85.
[133] Direct Testimony of Elizabeth Chira ¶47.
[134] Exhibit 197, Elizabeth Chira's Explanation of "Diversions."
[135] Trial Trans. 8/22/06, p. 212–14; Exhibit 141, W-2s; Exhibits 149 and 153, accountant's income statements for year-end (August 2005) and December 2005.

By the time of Denis' bankruptcy, he had neither a home nor any other assets of value except his interest in the hotel.[136] For the past two years, he has been a salesman at Uncle Mel's Used Car Clearance Center, earning two to three thousand dollars a month.[137]

The Trustee encountered a jumble of prepetition litigation—at least four state court suits, seven state court appeals, and a federal district court suit. The suits appear at first blush to be grounded in a series of questionable transactions by Denis: a 2000 borrowing from City First Mortgage Corporation[138] (whose successor is now First Trust Corporation as Trustee for investors), encumbering Denis' half interest without Elizabeth's permission;[139] a 2001 contract and deed of Denis' interest to Nofal Kahook or his company, Sheldon Beach Resorts, Inc. ("SBRI");[140] a 2002 consent judgment by Denis to Elizabeth;[141] more grants by Denis to SBRI in 2003 and 2004;[142] a 2003 deed of one-half of Denis' half interest to Tiffany, purportedly in connection with their divorce;[143] and, finally, a 2005 "global settlement agreement" by which Denis agreed to deed his interest in the hotel to Elizabeth in exchange for a used BMW, a forgiveness of non-child support debt, and Elizabeth's promise to pay $310,000 to SBRI.[144] Some of these transactions had been set aside in state court, and actions to set aside other transactions were still pending at the time of Denis' bankruptcy filing.

Upon a more careful consideration of the evidence presented, it has become clear that there are really two common themes running through the entire sorry chronology of Denis and Elizabeth's

---

[136] Exhibit 98, Schedules of Assets and Liabilities, *In re Denis Chira*, Debtor.
[137] Exhibit 98, Schedules and Statement of Financial Affairs, question 1.
[138] Exhibit 14, City First Mortgage and Security Agreement.
[139] Pretrial Order ¶18.
[140] Exhibit 26, Agreement of Purchase and Sale; Exhibit 27, Mortgage; and Exhibit 28, Warranty Deed.
[141] Exhibit 51, Motion for Entry of Final Judgment.
[142] Exhibit 48, Notice of Interest in Proceeds and Exhibit 49, Agreement for Settlement of Lawsuit.
[143] Exhibit 40, Quitclaim Deed.
[144] Exhibit 65, Joint Stipulation for Global Settlement Agreement.

post-dissolution conflict.  One is that Denis took every opportunity presented to him to derive value from *his own* one-half interest in the hotel, often secretly and sometimes in violation of agreements he had made with others.  The other is that Elizabeth created and exploited every opportunity to derive value for herself from *Denis'* one-half interest in the hotel.  Denis the bad husband schemed repeatedly after his divorce to leverage his own half interest.  Elizabeth the vindictive wife schemed repeatedly after her divorce to cause economic injury to Denis.

Denis Chira, who has never had counsel in this bankruptcy case, is not only a poor husband, but also a poor witness.  He conceded at his deposition that he has a very poor memory,[145] but at trial he didn't remember having said so.[146] He signed a written direct testimony composed by the Trustee's counsel, which he conceded had at least three errors.[147]

Elizabeth is even less reliable as a witness, her credibility impeached often during the trial by prior inconsistent statements and documentation. Her courtroom demeanor while testifying further eroded her credibility.  She was routinely vague and evasive in response to questions which could be answered directly but where the truthful answer would be adverse to her interests.

Elizabeth has spent years obstructing the sale of the hotel in a manner which would cause damage to Denis but not to herself.  How she did it requires an explanation of some length.

Seven years ago Denis and Elizabeth were a newly divorced couple with a valuable property that was worth perhaps four or five million dollars,[148] subject to a $375,000 mortgage which was

---

[145] Deposition transcript of Denis Chira, 8/2/06, p. 347; Trial transcript 8/23/06, p. 408.

[146] Trial transcript 8/23/06, p. 407–08.

[147] His written testimony states that Elizabeth talked to potential hotel purchaser Gus Boulis in Denis' presence, but he stated on cross-examination that he and Elizabeth dealt with Mr. Boulis only through a broker. Denis stated in his written proffer that the manager prior to the receivership was Mr. Grant.  He later conceded that the managers were James Levy and others, and that Mr. Grant was employed by the receiver. Denis stated in his written testimony that he made the global settlement agreement at least a week before January 28, 2005; he later testified that he made the agreement the week of January 24.

[148] Trial Trans. 8/22/06, p. 153.

current.[149]  In the divorce Elizabeth retained the marital home, which she later sold for $825,000.[150]

Denis retained several cars.  They each kept: small tourist shops facing the beach on the first floor

of the hotel,[151] their undivided half interests in the hotel, and their 50% interests in Sheldon Beach

Lounge Corp. ("Lounge Corp.").[152]

Denis and Elizabeth had agreed in the divorce documents to sell the property.[153]  But the

evidence indicates that Elizabeth had other ideas. She had strong motivation not to sell, in spite of

the court-approved agreement.  And upon sale of the hotel, Denis would no longer have to pay one-

half of his daughter's expenses.[154]  Elizabeth's and her daughters' expenses, later catalogued in a

general master's report, were very large,[155] and Denis' periodic child support is not credited to these

expenses.  Further, she would control the property's cash flow, and would claim a $2,000 per week

salary for controlling the operations.[156]

According to the mediation agreement incorporated into their divorce judgment, $400,000

in assets, presumably paid for or improved by Denis, but already in Elizabeth's name, was to be

credited by her to *his* child support obligation. She was to do it by setting up a trust fund for the two

daughters from her share of the hotel sale proceeds. That amount represented his lump-sum child

---

[149] Trial Trans. 8/22/06, p. 152–53.

[150] Trial Trans. 8/22/06, p. 72.

[151] Trial Trans. 8/22/06, p. 52–55.

[152] At that point the Chiras could have walked away with at least two million dollars each by selling the hotel and either paying a 15% income tax on the capital gain or making a like-kind exchange for separate properties under Section 1031 of the Internal Revenue Code. That they did not do so is tragic.

[153] Trial Trans. 8/22/06, p. 38, 40–41; Exhibit 7, 1999 Mediation Agreement.

[154] Exhibit 7, Mediation Agreement, ¶5(J).

[155] Exhibit 64, Report of General Magistrate.

[156] Although no expert evidence was introduced at trial, I find it inherently unreasonable that Elizabeth's services to the Property were worth $2,000 per week.  I reach this conclusion based upon Elizabeth's own testimony regarding the services which she provided and in light of the modest cash flow generated by the hotel.  I do not discount Elizabeth's salary claim for purposes of calculating her claims against Denis' estate, but do take into account her clear overreaching with respect to salary in determining whether her claims should be equitably subordinated under § 510(c).

support.[157]  Elizabeth stated at trial that Denis' obligation to pay their daughters' substantial living

expenses, on top of the $1,000 per month, will continue until his *death,* despite the fact that one of

the daughters is married,[158] ***so long as the hotel is not sold***.  Elizabeth had a clear motive to block

or delay any sale of the hotel.

      Elizabeth also had the means and the opportunity to prevent the sale, impoverish Denis, and

help herself in the process.  It required some ingenuity.

      First, she presented a master lease in June 1999 to be signed in conjunction with the divorce

agreement.[159]  It was like other leases that Lounge Corp. had held before, she says, but this one was

for 15 years,[160] a period vastly longer than any prior lease.

      Denis was once a director of Lounge Corp.,[161] but Elizabeth had purported to remove him

as a director without his knowledge or consent sometime in the 1990s by filing a report with the

Florida Secretary of State.[162]  She testified that he signed over his stock certificate to her,[163] but the

certificate never made it to court even though Elizabeth knew that one issue in this case was whether

Denis had ever agreed to resign as a director.[164]

      With the master lease in place, and as the sole director of Lounge Corp., Elizabeth could

insist that any buyer of the hotel negotiate first with Lounge Corp. to buy out the long-term leasehold

interest.  Lounge Corp. has no other asset except the 1999 Business Lease;[165] however, the Lounge

---

[157] Exhibit 7, ¶5(H),(I), and (J).
[158] Trial Trans. 8/22/06, p. 160–62.
[159] Trial Trans. 8/22/06, p. 165, Exhibit 9, Business Lease; Pretrial Order ¶23.  There weren't any paying tenants at the time of the divorce. Trial Trans. 8/22/06, p. 175–77.  The only occupied spaces were the two stores that Denis and Elizabeth owned. *Id.*
[160] Pretrial Order ¶15.
[161] Trial Trans. 8/23/06, p. 350.
[162] Direct Testimony of Denis Chira ¶10.
[163] Trial Trans. 8/23/06, p. 352.
[164] As a matter of law, Denis could not be removed as director by action taken solely by one 50% shareholder.
[165] Direct Testimony of Denis Chira ¶9.

23

Corp. lease did not give Elizabeth the leverage over the entire property that she apparently desired. Despite his removal as a director, Denis was still a 50% owner of the corporation, and could force a partition or other liquidation of Lounge Corp. in the event of a deadlock in stockholder voting.

There was also a substantial danger that the Lounge Corp. lease would someday be found by a court of equity jurisdiction to be merely a veneer, a sham or a device meant merely to provide insulation from premises (and, in light of the prior operation of a nightclub, alcohol-related) liability and not really meant to establish a true lessor-lessee relationship. The lease was never honored or performed, and I find that it was never even intended to be honored or performed.[166]  Though Elizabeth recalls otherwise, the lease plainly provides that it covers only the retail space, and not the Sheldon Beach Hotel or the parking lots.[167]

Elizabeth agrees that the rental amount was set using an undefined term which meant "all the rents received from the subtenants, including escalations."[168]  But Lounge Corp. has never paid rent under the Master Lease.  From the 1970s, through the time when there were non-insider retail tenants, even through and since the termination of the receivership, Lounge Corp. always collected *all* the rents—retail, hotel, and parking concession—paid *all* the expenses except mortgage and taxes, and remitted the net cash flow to the stockholders.[169]  Since 1999 Elizabeth says that there has been no net cash flow.[170]

Lounge Corp. is really just the management company for the hotel.[171]  But the lease remains, albeit that neither Denis nor Elizabeth never acted in accordance with the terms of the lease.  I find

---

[166] Trial Trans. 8/22/06, p. 28, 29, 139, 170–79; Direct Testimony of Denis Chira ¶3.
[167] Trial Trans. 8/22/06, p. 166–69; Exhibit 9, Business Lease.
[168] Trial Trans. 8/22/06, p. 173, 177
[169] Trial Trans. 8/22/06, p. 170–71, 172.
[170] Trial Trans. 8/22/06, p 215–18.  This testimony underscores the excessive nature of Elizabeth's $2,000 per week salary.
[171] Trial Trans. 8/22/06, p. 169.

24

that although the lease may have been intended at its origin in the 1970's to protect the Property from liability, it has long since become and now is a sham. Elizabeth has seized upon the lease in its present preposterous 15-year term to use as an obstacle to the sale of the Property.

Second, Elizabeth structured a lease of her own as an obstacle to Denis's ability to derive his fair share of the Property's value in the event that a sale were proposed. She gave Denis the opportunity to take a second store, a corner location larger than his store in the old lobby. The second store would be rent-free to Denis.[172] She would move her store to the other corner location and would rent out her old location.[173] In that way, they would each have two stores rent free.[174] That was an easy decision for Denis. While they looked for a buyer, he would at least have some income from the hotel that wouldn't be controlled by her.

Denis leased out *his* store on terms consistent with the expectation that the Property would soon be sold: a one-year lease to Distinctive USA with four one-year options.[175] Elizabeth leased hers in the name of Lounge Corp., to her own company, Swim & Fun Wear Corp., at a rental of only $2,000 per month.[176] She insists that her store and Denis' store had to be leased through Lounge Corp., and that she and Denis were not supposed to collect the rent themselves. She concedes that they had not paid rent on their own stores in the past.[177] Furthermore, her statements are inconsistent with the December 6, 1999 letter agreement and with the second page of the Swim & Fun Wear lease.[178]

---

[172] Trial Trans. 8/22/06, p. 53–54; Direct Testimony of Denis Chira ¶4.

[173] Trial Trans. 8/22/06, p. 54–55.

[174] *Id.*; Exhibit 185, letter agreement; Direct Testimony of Denis Chira ¶4.

[175] Trial Trans. 8/22/06, p. 165, Exhibit 109.

[176] Exhibit 184, Business Lease. By comparison, Distinctive USA agreed to pay $4,700 for a one year lease with four one-year options.

[177] Trial Trans. 8/22/06, p. 134.

[178] Exhibit 184, Lease between Lounge Corp. and Swin & Fun Wear. The first and second pages of the lease do not match up, but Elizabeth testified that is how it was drafted.

She never paid rent anyway.[179]  Eventually the Receiver forced both Denis and Elizabeth to vacate their stores.

The most notable thing about the Swim & Fun Wear lease is not its low rent. It is that it is a 15-year lease with no cancellation clause.[180]  Even the restaurant tenant (Pinasse d/b/a Chez Andre), whose FF&E investments were obviously huge in comparison to those of a swimwear shop, had a lease for only five years, later extended to seven years.[181]  I find that there is only one plausible explanation:  Elizabeth intended to and did use the lease to control the sale of the Property.

Denis took roughly $80,000 from insurance checks sometime in 1999 or 2000,[182] and it was agreed that $33,800 of that sum was properly Elizabeth's share.[183]  He never denied taking the funds, but he never repaid them.  Elizabeth's claim to a portion of the insurance recoveries is included in the claim calculations described above.

After the 2000 season, Elizabeth told Denis that there were no profits.[184]  With the property still unsold, and having recently remarried, Denis borrowed $425,000 against a second mortgage on his half-interest in June 2000.[185]  In September 2000, after another mediation, Elizabeth agreed that she would cooperate in selling the Property for any offer of $4,750,000 or above.[186]  But she rejected Gus Boulis' "verbal offer of $4,750,000 which was less than the hotel's fair value."[187]

---

[179] Trial Trans. 8/22/06, p. 134; Direct Testimony of Denis Chira ¶3.
[180] Trial Trans. 8/22/06, p. 150–51.
[181] Exhibit 111, Business Lease; Exhibit 112, Second Addendum.
[182] Trial Trans. 8122/06, p. 154, 162–63, 216–17.
[183] Trial Trans. 8/22/06, p. 163, 210; Trial Trans. 8/23/06, p. 391.
[184] Trial Trans. 8/22/06, p. 216; Direct Testimony of Denis Chira ¶4.  In light of Elizabeth's self-designated $2,000/week salary, it is understandable that there were no profits.
[185] Exhibit 14, City First Mortgage and Security Agreement; Exhibit 186, Promissory Note.  Denis' hypothecation of his own half-interest was later approved by a special master, the circuit court, and the Fourth District Court of Appeal.
[186] Trial Trans. 8/22/06, p. 38; Exhibit 187, 2000 Mediation Agreement.
[187] Direct Testimony of Elizabeth Chira ¶20; Direct Testimony of Denis Chira ¶4 (second paragraph 4).

Denis borrowed another $150,000 against the City First second mortgage on his half of the Property.[188]

In a mediation agreement on January 5, 2001,[189] Elizabeth agreed that if she were given 30 days to buy Denis' half of the property for $1,670,000, then Denis could have five months to buy out her equity for the same price.[190] She couldn't, and he couldn't. Numerous other offers were presented for the property, some of them through Eliezer Botton, Elizabeth's brother and a broker whose company is called Two Percent Realty. The only offer that Denis ever opposed was the Frieda Koren offer,[191] presented by Eliezer. Elizabeth accepted that offer, but only because it shifted $800,000 of the $4,850,000 price to Elizabeth in order to buy out her Swim & Fun Wear lease.[192] This left Denis with less than the benefit he would have derived from the $4,750,000 agreed price-to-sell established by the Chiras in their September 2000 mediation agreement or the $4,750,000 verbal offer from Gus Boulis which Elizabeth rejected shortly afterwards.

After the 2001 season, Elizabeth had not paid the 2000 real estate taxes,[193] and she told Denis again that there was no net cash flow that season.[194] Denis responded by filing a motion to compel compliance with the mediation agreement.[195] Instead of returning to mediation, as the January 2001 agreement required after six months,[196] Elizabeth filed a motion for contempt for failure to pay child support, and set the motion for hearing on July 23.[197] This contempt motion was filed at a time when

---

[188] Exhibits 16, 17, and 18, Advance Note, Mortgage, and Modification Agreement.
[189] Exhibit 126, Mediation Agreement.
[190] Trial Trans. 8/22/06, p. 221–22; Pretrial Order ¶32.
[191] Trial Trans. 8/23/06, p. 404–06; Exhibit 180, Commercial Contract.
[192] *Id.;* Direct Testimony of Denis Chira ¶4 (second paragraph 4).
[193] Exhibit 81, letter from Jeffrey Sarrow to Eliezer Botton; Exhibit 117, Letter from Transcapital Bank; Exhibit 178, Tax Certificates.
[194] Trial Trans. 8/22/06, p. 110–11, 211–12, 215–16.
[195] Exhibit 157, Case Docket, entry for March 7, 2001.
[196] Exhibit 126, Mediation Agreement, Article V.
[197] Exhibit 157, Case Docket, entry for June 19, 2001.

Denis and his second wife Tiffany had sold their home,[198] and only a few days before First Trust filed its foreclosure complaint on its second mortgage on Denis' half interest in the hotel.[199] When the special master ruled soon thereafter that Denis was in contempt for his child support delinquency, Denis stormed into the hotel, filled trash bags full of records, told the guests the hotel was closed, and left, changing the locks in the process.[200] A few days later, he reopened the hotel business, but never reviewed the records in the bags he had taken with him.[201]

It was at this time (August 2001) that Denis agreed to sell his interest to Nofal "Nick" Kahook and Kahook's Sheldon Beach Resorts, Inc. ("SBRI") for a quick $50,000 and another $950,000 in the future.[202] In response to Denis taking back over the hotel and the pending sale of his interest to Kahook, Elizabeth filed a motion to appoint a receiver.[203]

During the purge period after the July 23 contempt finding against him for failure to pay child support, Denis failed to cure his one-half of the monthly payments on Transcapital's $375,000 first mortgage, which was either one or two months in arrears.[204] Elizabeth could have paid the whole $6,000[205] until Denis had met his contempt purge obligation, but she didn't. When she received a notice from Transcapital warning that it would cost $30,717.58 up front to fund the tax and insurance escrow,[206] presumably as a result of not paying the 2000 taxes, she stopped paying even her half of the payments.[207]

---

[198] Exhibit 13, Warranty Deed.
[199] Exhibit 191, Notice of *Lis Pendens*.
[200] Trial Trans. 8/22/06, p. 104; Trial Trans. 8/23/06, p. 400.
[201] Trial Trans. 8/23/06, p. 400; Pretrial Order ¶34.
[202] Exhibit 26, Agreement of Purchase and Sale; Exhibit 28, Warranty Deed; Pretrial Order ¶38.
[203] Trial Trans. 8/22/06, p. 35–36, 230–31; Pretrial Order ¶37.
[204] Exhibit 116, Transcapital's Note Transcript Statements.
[205] *Id.*
[206] Exhibit 117, Letter from Transcapital.
[207] Trial Trans. 8/22/06, p. 230.

Instead she determined to buy the mortgage, leaving the property exposed to default interest of 18%.[208]  I find that she did so as part of a well-designed squeeze play aimed at sucking Denis' equity out of the Property for her own benefit.  Elizabeth testified that the bank would not sell the mortgage to her, and so she enlisted Eliezer to purchase it, using her funds.  She borrowed against a mortgage on her house[209] at market rate and loaned Eliezer $373,276.85, exactly the amount necessary to buy the Transcapital mortgage.[210]  She had Eliezer and his wife sign a note[211] which promised her a fixed 18% return.[212]  Eliezer knew that Elizabeth had loaned money to her brother Sami and had foreclosed on Sami's property after he failed to pay,[213] but he apparently had no concern in obligating himself and his wife to an interest rate that only made sense as a means of passing through the default interest that Eliezer would charge against the hotel property.  Based upon my assessment of the testimony and credibility of both Elizabeth and Eliezer, I conclude that the tale about Elizabeth's foreclosing on Sami was a red herring, craftily designed to create a false impression that Elizabeth intended to be tough toward her other brother, Eliezer, in respect of this debt.  The truth of the matter, however, is that Elizabeth has throughout acted in a manner wholly at odds with that false impression.  Instead, it is clear, and I find, that the structure of the Eliezer-Elizabeth note was singularly calculated to burden Denis' half of the Property with an 18% interest rate, the entire benefit of which would flow through to Elizabeth.

Although the note from the Bottons to Elizabeth requires monthly payments, it doesn't state how much the payments are, whether the principal is amortized, or when the loan matures.  In fact,

---

[208] Trial Trans. 8/22/06, p. 64; Composite Exhibit 89, Past Due Notices from Eliezer Botton.
[209] Pretrial Order ¶46.
[210] Trial Trans. 8/22/06, p. 58.
[211] Exhibit 87, Promissory Note.
[212] Trial Trans. 8/22/06, p. 58–5 9, 67.
[213] Trial Trans. 8/22/06, p. 72–73.

29

no payments have ever been sought or made on that note. Elizabeth testified that she hasn't given any thought to the statute of limitations,[214] and has never asked Eliezer for the monthly payments mandated by the note.[215] Eliezer claimed that he assumed, without any agreement, that she will not collect it until the property sells, unless she someday runs out of other funds with which to pay her attorneys.[216] By structuring the transaction this way, Elizabeth has been able to (a) keep it secret from the courts and the parties, until the information was requested in the discovery phase of this adversary proceeding, (b) maintain her equity in the hotel property and yield an 18% return in the process, and (c) cause her partner in the hotel business, Denis, to lose equity in the property for so long as she could delay the sale and keep the default-rate mortgage in place.

Eliezer testified that he thought he had no risk of loss, but no prospect of gain (except the prospect of an eventual sale commission).[217] The estoppel letter which Transcapital Bank gave to Eliezer[218] shows that the bank had taken the loan out of default status on October 16, a week before the sale of its note to Eliezer,[219] but – with the obligation to pass an 18% return on to Elizabeth – he immediately began charging the property with 18% default interest even though the bank's note was not in default at the time he acquired it. To add insult to injury, Eliezer compounded the interest each month, though there is no such provision in the note;[220] he declined to accelerate the debt, and therefore ran monthly late charges for five years; and he charged the property with $7,000 of the $17,000 that he had paid (with Elizabeth's money) for the privilege of the assignment.[221]

---

[214] Trial Trans. 8/22/06, p. 297. The five year limitations period for enforcing written contracts which are in default has expired.
[215] Id.
[216] Trial Trans. 8/22/06, p. 61, 66–67, 73.
[217] Trial Trans. 8/22/06, p. 105.
[218] Exhibit 88, Estoppel Letter.
[219] Trial Trans. 8/22/06, p. 69–72.
[220] TrialTrans. 8/22/06, p.64–66.
[221] Trial Trans. 8/22/06, p. 62.

Around the time of his appointment, the Receiver learned that Denis had leased out a retail space to Joe's Ocean Market.[222] The Receiver promptly told Denis to vacate the store space in which Denis had operated his stores, Maui Surf Shop and the Eagle's Nest, on a rent-free basis.[223] Denis did so. Elizabeth, by contrast, refused either to leave her store (Swim & Fun Wear) or to pay rent to the Receiver.[224] The Receiver obtained an order dated November 21, 2001, clarifying that the receivership was over the entire Property and Lounge Corp., and that no one was permitted to interfere with the Receiver's control over the property.[225] Paragraph 2 of the order provides:

> The court reiterates that no person or entity other than the Receiver shall have authority to collect or retain rental or operating income relating to the Sheldon Hotel or receivership estate without the written consent of the Receiver nor shall any person or entity be permitted to transfer, convey, encumber or hypothecate any asset relating to the receivership estate except to the extent of obtaining duly issued Receivers Certificates, without prior approval.[226]

Copies of the order were served on counsel for Denis and Elizabeth, and upon Eliezer.

Elizabeth ignored the order. She rented one of the spaces to Fabio Sandino in her own name, took a security deposit, and refused to turn over the rents until the Receiver obtained a further court order requiring her to disgorge them.[227] She also continued to refuse to pay rent for her own Swim & Fun Wear space and eventually was evicted by the Receiver.[228] She interfered with tenants, and even served a three-day eviction notice on one of them.[229] Although the state court specifically declined to enter any sanctions against Elizabeth for her alleged misconduct in connection with the

---

[222] Exhibit 30, Memorandum of Lease; Pretrial Order ¶41.
[223] Trial Trans. 8/22/06, p. 47–48; Pretrial Order ¶35.
[224] Trial Trans. 8/22/06, p. 237–38; Pretrial Order ¶44.
[225] Trial Trans. 8/22/06, p. 236–37; Exhibit 74, Order on Receiver's Motion for Clarification and Instructions; Pretrial Order ¶82.
[226] Pretrial Order ¶82; Exhibit 74, Order granting receiver's motion for clarification.
[227] Trial Trans. 8/22/06, p. 196, 236; Exhibit 110, Business Lease with Fabio Sandino; Direct Testimony of Denis Chira ¶6; Exhibit 42, Memorandum Order
[228] Pretrial Order ¶48(iii).
[229] Trial Trans. 8/22/06, p. 236, 242, 244; Exhibit 42, Memorandum Order.

sublease to Sandino,[230] Judge Korda noted in his August 2003 order the occasions on which he had admonished her for her interference.[231]   The Receiver's attorney, Mr. Sarrow, testified at trial that Elizabeth was unnecessarily litigious, going beyond the bounds of legitimately arguable challenges to the Receiver's actions after the initial months of the receivership.[232]

Eliezer initially assisted the Receiver, advancing $43,000 for various repairs and vendor's bills.[233]   The Receiver promised to issue receiver's certificates bearing 9% interest,[234] and obtained an order granting him the authority to issue receiver's certificates,[235] but Eliezer told Mr. Sarrow that he didn't want receiver's certificates since he planned to charge the property 18% interest under the mortgage for the $43,000 advance.[236]   At no time did Eliezer receive receiver's certificates.[237]   Later Eliezer sided with his sister in seeking to remove the Receiver, who was demanding that Elizabeth honor the same terms as Denis by either paying rent or vacating her store space.[238]   The divorce court docket[239] shows that they filed separate motions in the fall of 2002 to remove the Receiver and his counsel from the case.

Elizabeth unsuccessfully challenged one of the Receiver's or counsel's application for fees,[240] and unsuccessfully appealed the adverse order.[241]   She litigated unsuccessfully with First Trust to try to void the mortgage on Denis' half interest,[242] and then unsuccessfully appealed three of the

---

[230] Pretrial Order, ¶84.
[231] Trial Trans. 8/22/06, p. 242–45, Exhibit 42, Memorandum Order; Direct Testimony of Denis Chira ¶6.
[232] Trial Trans. 8/22/06, p. 194–96.
[233] Trial Trans. 8/22/06, p. 78–79; Composite Exhibit 120, backup documentation for $43,000 advance.
[234] Trial Trans. 8/22/06, p. 192; Exhibit 79, letter from Jeffrey Sarrow to Eliezer Botton.
[235] Exhibit 74, Order granting receiver's motion for clarification.
[236] Trial Trans. 8/22/06, p. 79, 80–81, 206–08.
[237] Pretrial Order ¶50.
[238] Trial Trans. 8/22/06, p. 89.
[239] Exhibit 157, Case Docket.
[240] Exhibit 177, Notice of Appeal; Pretrial Order ¶51.
[241] Trial Trans. 8/22/06, p. 88.
[242] Direct Testimony of Denis Chira ¶7.

judgments entered in First Trust's favor.[243] In the event, she lost every appeal she filed.

The divorce case docket[244] shows that Denis filed several motions directed toward forcing the sale of theProperty.  But the cost of litigating with Elizabeth, who controlled the jointly-owned property, its cash-flow and bank account, and its operations, was a burden that Denis couldn't afford. Elizabeth must have known from the Notice of Charging Lien filed in October 2002 that Denis' attorneys were not being paid.[245]  This coincided with a special opportunity for Elizabeth to gain another advantage.

Denis's second wife, Tiffany, had him arrested in the fall of 2002 for alleged spousal abuse, and Elizabeth testified in that proceeding that his term of house arrest on an ankle monitor should not be shortened.[246]  She described this at trial as doing him a *favor*, because she brought his daughter to his house to visit him since he could not leave home.[247]  Quite to the contrary, I find that Elizabeth's actions in this regard were calculated to squeeze Denis as hard as she could, and from every direction, for her own personal financial and emotional benefit.

While she was threatening to keep his daughter from him, and to have him arrested yet again for child support defaults, Denis briefly supported Elizabeth's motion to remove Receiver, and even gave Elizabeth a $2,500,000 consent judgment,[248] but recanted his support at the hearing.[249]  Judge Korda later recounted that real estate broker Lew Manesioutis corroborated Denis' story that

---

[243] *Id.*
[244] Exhibit 157, Docket.
[245] Exhibit 59, Notice of Charging Lien; Exhibit 60, Final Judgment and Order in Favor of Barry G. Roderman & Associates, P.A.'s Motion to Establish Amount of Charging. Lien, Enforce Charging Lien and Foreclosure on Charging Lien Against Denis Chira, Individually and the Sheldon Hotel.
[246] Trial Trans. 8/22/06, p. 241–42.
[247] *Id.*
[248] Exhibit 100, Stipulation for Entry of Final Judgment; Exhibit 34, Final Judgment; Pretrial Order ¶52; Direct Testimony of Denis Chira ¶5.
[249] Trial Trans. 8/22/06, p. 23 8–40.

33

Elizabeth had used improper threats in order to induce Denis to sign the consent to judgment. She procured it in First Trust's foreclosure case rather than in the divorce case, and procured it without notice to the other parties in the case. The amount far exceeded any claim against him she had ever made, would ever make, or could ever sustain.[250]  On June 19, 2003, the court in the First Trust foreclosure case entered an order vacating the $2.5 million consent judgment.[251]

As a result of her misconduct and Denis', Judge Korda concluded that the couple would never be able to sell the Property, and so he authorized the Receiver to find a buyer for the whole Property.[252] This the Receiver quickly did, for a price of $5,850,000.[253] Elizabeth appealed from the August 2003 order authorizing the Trustee to sell,[254] which was affirmed on appeal, but did not appeal from the January 2004 order actually approving the sale to Saal.[255]

Elizabeth had few duties for the hotel,[256] but unilaterally drew a $104,000/year salary.[257] James Levy and several interim managers performed the day-to-day onsite duties, including supervising the cleaning crew and desk staff, keeping the guest records ("daily report") for hotel surtax purposes, collecting the retail tenants' rents, reconciling the day's receipts, making the bank deposit, interacting with the accountant each month, and maintaining vendor and contractor relationships.[258] Elizabeth made the ultimate decisions and negotiated leases.[259]  Mike Dayan, the hotel manager since March 2005, is an experienced businessman who was paid $700 per week in

---

[250] Trial Trans. 8/22/06, p. 239–40.
[251] Exhibit 46, Order on Motion to Vacate Fraudulent Consent Judgment.
[252] Exhibit 42, Memorandum Order; Pretrial Order ¶59.
[253] Exhibit 42, Contract for Sale and Purchase; Pretrial Order ¶61.
[254] Trial Trans. 8/22/06, p. 195; Exhibit 42, Memorandum Order; Pretrial Order ¶60.
[255] Exhibit 44, Order Granting Receiver's Motion to Accept Purchase offer and Sell Assets of Receivership Estate.
[256] Direct Testimony of Denis Chira ¶4.
[257] Trial Trans. 8/22/06, p. 209–10, 211–13; Direct Testimony of Denis Chira ¶4.
[258] Trial Trans. 8/22/06, p. 45, 51; Direct Testimony of Denis Chira ¶4.
[259] Trial Trans. 8/22/06, p. 323–24.

early 2005 and later received a raise to $800 per week.[260]  Although I recognize that Elizabeth's

entitlement to a $2,000 per week salary was already adjudicated in the January 2005 special master

report which was adopted by Judge Korda, and will not revisit that issue, the excessive nature of that

salary in comparison to Elizabeth's actual duties is a significant factor in my analysis of Elizabeth's

over-reaching and strongly buttresses my conclusions discussed below regarding equitable

subordination.

　　　The Fourth District Court of Appeal's order affirming the sale authorization order was

entered in December 2004.  By the time of the affirmance, the order approving the particular sale

terms for Mr. Saal was already final and no longer subject to appeal or review.  Nothing could stop

the Saal sale from closing except either Saal or the Receiver backing out of the contract.  Still,

Elizabeth engaged in another stall tactic:  She made the "global" settlement agreement with Denis

and SBRI, and then sought the discharge of the Receiver in order to vitiate the Saal contract that

Judge Korda had long-before approved.[261]  Judge Korda denied her motion,[262] and I have since found

that the discharge of the Receiver had no effect on Denis' and Elizabeth's duty to close on the sale,

*In re Chira,* 343 B.R. 361 (Bankr. S.D. Fla. 2006).[263]

　　　Eliezer continued to make investments in the Property which he and Elizabeth thought would

yield an 18% rate of return.  He paid the Receiver and his counsel $375,000 for their agreement to

be discharged.[264]  That amount was actually a slight overpayment of the Receiver and counsel fees,

even after including interest, but Eliezer never questioned the fee quote, never asked for an itemized

---

[260] Trial Trans. 8/23/06, p. 333.
[261] Exhibit 65, Joint Stipulation for Global Settlement Agreement.
[262] Trial Trans. 8/22/06, p. 96–97, 200; Pretrial Order ¶77.
[263] That order is currently on appeal.
[264] Trial Trans. 8/22/06, p. 82, 91–92; Trial Trans. 8/23/06, p. 294; Exhibit 77, Check to Jeffrey A. Sarrow, P.A.

bill, never verified the amount, never sought court determination of the reasonable amount of fees, and never sought a rebate of any overpayment.[265]   In short, he was paying to "get rid of" the Receiver, and he and Elizabeth believed that they were getting good value for money.   Although the Trustee argued that Elizabeth's intent was to quickly take title to Denis' half of the Property, I conclude that her real intent was to continue to squeeze Denis.   It was clearly her ultimate goal to force Denis out of the Property, but until that could be accomplished, Elizabeth was content to block the sale of the Property, collect her $2,000 per week salary, and accrue 18% default interest.[266] Eliezer and Elizabeth were counting on Judge Korda finding that Mr. Saal's court-approved contract would be extinguished by the discharge of the Receiver.   That supposition was wrong.   As I have previously ruled,[267] Judge Korda intended that the Saal sale contract survive the discharge of the Receiver and that contract remains a valid executory contract.

Even after the filing of the involuntary bankruptcy petition against Denis and the imposition of the automatic stay provided by 11 U.S.C. § 362(a), Eliezer went to the Broward County Revenue Collector's office and paid nearly $200,000 in taxes on the Property.[268]   He falsely claimed at trial that the tax certificates were carrying 18% interest, so that his converting the tax liens into mortgage indebtedness was neutral for the Property.   The truth of the matter is that the Revenue Collector's records reflect much lower interest.[269]   Once again, Eliezer, acting on Elizabeth's behalf,  was actually converting a debt that ran for another person's benefit at a lower rate into a debt that ran for

---

[265] *See* Trial Trans. 8/22/06, p. 83, 84, 85–88.
[266] The 18% default rate purportedly accruing on Eliezer's mortgage encumbered the entire Property.  Because the deal between Elizabeth and Eliezer called for an 18% return on Elizabeth's loan to her brother, the rate charged by Eliezer on his mortgage had a wholly neutral effect on Elizabeth.  However, with the passage of sufficient time, Denis' equity would be completely wiped out.
[267] *In re Chira,* 343 B.R. 361, *supra.*
[268] Trial Trans. 8/22/06, p. 74–75; Exhibit 84, Botton calculation of property taxes paid; Exhibit 86, receipts regarding payment of taxes.
[269] Trial Trans. 8/22/06, p. 74–76.

36

Eliezer's (and ultimately Elizabeth's) benefit at an 18% rate.

Elizabeth's manifest strategy of creating obstacles to sale continued during this bankruptcy proceeding. In November and December 2005, she caused Lounge Corp. to enter into three leases that appear on their face to be long-term leases, but are accompanied by secret addenda negotiated and signed as part of the same bargain as the leases.[270] For example, one of the lease's pages are numbered "1 of 6, 2 of 6, etc." but the secret contemporaneous addendum to that lease is contained on "Page 7 of 6." That addendum, as with the addenda on the other two leases, provides that the lease could be cancelled on short notice and, by its own terms, prohibits the disclosure of the addendum as a matter of contract. Elizabeth eventually admitted during her testimony that the reason for the secret addenda was so that *she* could decide when it would be to her advantage to let someone know about the the fact that the leases were actually terminable on short notice.[271] The addenda's termination clauses directly contradict the lease language,[272] and could only have been intended as obstacles to sale, giving Elizabeth effective veto power over any sales.

Earlier in 2006, Elizabeth caused Lounge Corp. to unnecessarily defend a perfectly valid wage overtime suit which Lounge Corp. lost upon the plaintiffs' motion for summary judgment.[273] Elizabeth conceded that the overtime pay was due, but claimed during the litigation that she did not know that the Paychex payroll service contracted by the Receiver had not posted any of the overtime, and that because nearly all of the unpaid overtime accrued during the receivership, the employees

---

[270] Trial Trans. 8/22/06, p. 144–45; Trial Trans. 8/23/06, p.325–29.
[271] Trial Trans. 8/23/06, p. 330 (Q. "It doesn't appear to be that you could get out of that lease, or that the owner of that property could get out that of lease, does it?" A. "Yes, it is, you have a three month or six month that you gave them and you can take them out." Q. "That's the provision, though, that he wasn't allowed to tell anybody existed?" A. "But it can be used when I want to use it.")
[272] *Id.*
[273] Trial Trans. 8/22/06, p. 126; Trial Trans. 8/23/06, p. 301; Defendants' Exhibit B, Final Judgment Order.

should have pursue the discharged Receiver instead of Lounge Corp.[274]  The actual overtime obligation was some $15,000.  Although Lounge Corp. could have settled the case, it refused to do so and suffered a judgment for about $39,000, an amount which included multiple damages resulting from not having paid the claim when it was first raised.[275]  While awaiting a court hearing on the amount of attorney's fees, Lounge Corp. paid *$70,000* to settle, using funds borrowed from Eliezer.[276]  Elizabeth had Lounge Corp. enter into the settlement at a time when the plaintiff-employees' motion to hold her *personally* responsible for the damages was pending.[277]

None of the parties performed under the global settlement agreement.[278]  But her own non-performance hasn't stopped Elizabeth from seeking to exploit the agreement.  In early March 2005, Elizabeth received from Nofal Kahook's office a faxed draft of a deed signed by Denis and held in escrow pending closing which was sent to her to prove that Denis had actually signed the instrument.[279]  Elizabeth knew that the deed was held in escrow and constituted a mere representation of what the closing documents would have been had the global settlement agreement actually closed.[280]  She knew that she had not paid her consideration for the agreement.  Specifically, Elizabeth had not paid $310,000 to Mr. Kahook or delivered a specified automobile to Denis.  The deed was never recorded and no one had exchanged the required releases.  Notwithstanding these facts, during the summer of 2006, Elizabeth used her fax copy of the undelivered but executed deed

---

[274] Trial Trans. 8/23/06, p. 309–11.

[275] Trial Trans. 8/23/06, p. 300.

[276] Trial Trans. 8/23/06, p. 297–98, 302; Defendants' Exhibit A, Cashier's Checks.  The funds were quickly repaid by Lounge Corp. to Eliezer, Exhibit 197, though at first Elizabeth denied it.

[277] Trial Trans. 8/22/06, p. 304, 306, 309–11.

[278] Pretrial Order ¶83.

[279] Exhibit 194.  Elizabeth produced the document after she was questioned about it upon cross-examination, but she never produced the first two pages of the fax that accompanied the draft deed when it was transmitted to her from Mr. Kahook's office.  She testified that she recalled the first two pages were both blanks.  As with much of Elizabeth's testimony of key points, her contention on this point was not credible.  Simply put, I did not believe her.

[280] Trial Trans. 8/22/06, p. 253–55.

to convince her state court attorney that she had met a condition in the second addendum to the Pinasse lease, by which Pinasse would be obligated to pay a large amount of deferred rent if Denis conveyed his interest in the building to Elizabeth.[281] Her attorney, relying upon her representations, served a three-day notice and filed an eviction complaint, alleging "[t]hat on March 10, 2005 Denis Chira conveyed his interest in the property to Elizabeth Chira."[282]   Elizabeth knew that this representation was false.

### Conclusions of law

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. §§ 157(b)(1), 157(b)(2)(F), 157(b)(2)(H) and 157(b)(2)(K), and the District Court's Local Rule 87.2 referring proceedings to this court.[283]  This is a core proceeding.[284]

Thirteen of the counts in the complaint are directed toward the three remaining defendants, Elizabeth, Eliezer, and Lounge Corp.  Counts 1 through 6 sought the avoidance of the 2005 global settlement agreement and the 2002 consent judgment, which relief was consented to by Elizabeth at trial[285] without admitting the truth of the allegations in Counts 2, 3 and 6 (constructively fraudulent transfers) or Counts 1 and 5 (intentionally fraudulent transfers) or Count 4 (avoidable preference).

Counts 2 through 4 sought to recover Denis' one-half interest in the assets (hotel, contents, and Lounge Corp. stock), and also sought to recover for the estate, pursuant to 11 U.S.C. § 550(a), the full value of the avoided prepetition transfers, in the form of one-half of the hotel's or Lounge Corp.'s income taken later by Elizabeth.  Count 7 also sought the latter relief as to postpetition transfers.  As a result of the avoidance of the 2005 global settlement agreement and the 2002 consent

---

[281] Exhibit 112, Second Addendum.
[282] Trial Trans. 8/23/06, p. 285; Exhibit 193, Complaint for Tenant Eviction, ¶4.
[283] Pretrial Order ¶1.
[284] Pretrial Order ¶2.
[285] Trial Trans. 8/22/06, p. 4–5.

judgment, the court will treat any disproportionate recovery of profits – under whatever label – by Elizabeth since her return to the hotel in March 2005 as recoverable by the estate pursuant to § 550(a).

Count 12, as amended by the Amendment to Complaint dated April 14, 2006, seeks to equitably subordinate, below other creditors, that portion of the claim of Eliezer which seeks greater than simple interest at the pre-default contract rate against the Property. The Trustee does not seek to subordinate Eliezer's claim below the interest of Denis in any estate surplus.

Count 13 seeks to subordinate, below other creditors *and* below the Debtor's interest in any surplus, Elizabeth's claim to the extent that she caused damages to Denis or to the estate by her misconduct.

Count 14 seeks an accounting of the monies that Elizabeth has recovered through her control of the hotel and Lounge Corp. since the Receiver was discharged in March 2005.

Count 15 seeks a declaration that the Lounge Corp. lease is either a sham or is the alter ego of Elizabeth and Denis that may be disregarded or merged into their hotel property ownership.

Count 16, pleading alternatively to Count 15, seeks an order directing the sale of Lounge Corp. and the partition of the proceeds between the estate and Elizabeth.

Count 17 seeks a determination of the validity, priority, and amount of Elizabeth's, Eliezer's, and Lounge Corp.'s interests in the hotel, in its contents, and in Lounge Corp. The court therefore has before it the issues of the propriety of Elizabeth's, and Eliezer's, and Lounge Corp.'s, ownership interests, lien interests, and leasehold interest in the hotel, its contents, and the Lounge Corp. stock. Because Elizabeth and Lounge Corp. have taken the position in their proofs of claim that their claims

40

are secured by an interest in or setoff rights against Denis' interest in the Property,[286] they have been put on notice that the allowable amounts of their unsecured claims will necessarily be adjudicated in this adversary proceeding.

### Equitable subordination

The common law principle of equitable subordination has long been recognized by the Supreme Court, *Pepper v. Litton*, 308 U.S. 295 (1939), and is specifically adopted as one of the bankruptcy courts' equity powers by 11 U.S.C. § 510(c).

Equitable subordination law in this Circuit derives from the former Fifth Circuit's decision in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977) and holds that equitable subordination must be based upon inequitable conduct by the creditor:

> *Mobile Steel* laid out three conditions a bankruptcy court must find to exist before it equitably subordinates a claim. One, "[t]he claimant must have engaged in some type of inequitable conduct." *Mobile Steel*, 563 F.2d at 700. Two, "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Id.* And three, "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]."

*In re Lifshultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) (citing *In re Mobile Steel Co.*, 563 F.2d at 700). The *Mobile Steel* test was formally adopted by the Eleventh Circuit. *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986). The test does not require that the claimant's misconduct rise to the level of an intentional tort.

The power of equitable subordination may, in appropriate circumstances, be used to subordinate even the claim of a secured creditor. *See* 124 Cong. Rec. H. 11,095 (Sept. 28, 1978); S 17,412 (Oct. 6, 1978); *In re Tri-O-Clean, Inc.,* 230 B.R. 192 (Bankr. S.D. Fla. 1998) (Hyman, J.) (secured claim of affiliate of management company for Debtor reduced to unsecured status).

---

[286] Trial Exhibits 127, 128.

41

Insiders, those in a position of influence over the Debtor, are held to a higher standard than non-insider claimants, that is to say, their claims may be subordinated more easily than those of parties who dealt with the Debtor at arms' length. *Mobile Steel,* 563 F.2d at 701 (cited in *In re Multiponics,* 622 F.2d 709, 714 (5th Cir. 1980)); *In re Epic Capital Corp.,* 290 B.R. 514 (Bankr. D. Del. 2003). The plaintiff bears the burden of presenting material evidence of unfair conduct. Once this has been done, the insider defendant must prove the good faith and fairness of its dealings with the Debtor or the claim will be subordinated. *Allied Eastern States Maintenance Corporation v. Miller (In re Lefco Gypsum, Inc.),* 911 F.2d 1553, 1557 (11th Cir. 1990); *N&D Properties,* 799 F. 2d at 731, *Mobile Steel,* 563 F.2d at 701. The policy of requiring an insider creditor to demonstrate the inherent fairness of his or her claim, can be traced to *Richardson's Executor v. Green,* 133 U.S. 30 (1889). It is best known in the equitable subordination context from the Supreme Court's decision in *Pepper v. Litton,* 308 U.S. at 306:

> [Officers', directors', and stockholders'] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden in on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

Strictly scrutinized, as the Supreme Court has directed, an insider's actions may subject him or her to equitable subordination on the basis of inherent unfairness alone. On this basis, in *In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir. 1990), the court held that an insider's purchase of a non-insider's judgment should cause the purchased claim to be reduced to the amount the insider paid for the judgment, since the Debtor presumably could have settled the debt for the same amount.

### Insider relationship

Under bankruptcy law, "insider" is a flexible term. Rather than defining it, the Bankruptcy

Code gives non-exclusive examples. "The term 'insider' includes...." 11 U.S.C. § 101(31). "'Includes' and 'including' are not limiting." 11 U.S.C. § 102(3). The legislative history of the 1978 Code defines an insider as a person or entity with "a sufficiently close relationship with the Debtor that his conduct is made subject to closer scrutiny that those dealing at arm's length with the Debtor." S. Rep. No. 95-989, 95th Cong., 2d Sess., reprinted in 1978 U.S. Code Cong. & Admin. New 5787, 5810.

Among the examples given are "an affiliate, or an insider of an affiliate as if such affiliate were the Debtor." 11 U.S.C. § 101(31)(E). "Affiliate" is defined as including a corporation 20% or more of whose stock is owned by the Debtor. 11 U.S.C. § 101(2)(B). Lounge Corp. was such a corporation, and Elizabeth is plainly an insider to Lounge Corp.[287] "Affiliate" is also defined as including an "entity that operates the business or substantially all of the property of the Debtor under a lease or operating agreement." 11 U.S.C. § 101(2)(D). The Sheldon Beach Hotel was the Debtor's business as much as it was Elizabeth's, and (since by August 2001 Denis had sold his home) the hotel also represented substantially all of Denis' property. Elizabeth and Lounge Corp. are both "entities,"[288] and they both operated the business and property of the Sheldon Beach Hotel at the times when most of Elizabeth's unfair conduct occurred.

Even where the relationship does not fit within the examples given in the Code, a person may hold insider status. Courts that have considered the issue often hold that a former spouse is an insider as that term is used in bankruptcy law, where their relationship puts the non-debtor party in a position to exercise some degree of control or influence over the Debtor. *Hunter v. DuPuis (In re*

---

[287]  So, too, is Eliezer Botton an insider to Lounge Corp., since he is "a relative of a ...director, officer, or person in control of [the affiliate as if such affiliate were the Debtor]." *See* 11 U.S.C. § 101(31)(B)(6). Because Eliezer is an insider to Lounge Corp., he is an insider to Denis. 11 U.S.C. § 101(31)(E).

[288]  The term "entity" includes person....11 U.S.C. § 101(15). The term "person" includes... corporation.... 11 U.S.C. § 101(41).

*DuPuis)*, 265 B.R. 878, 885 (Bankr. N.D. Ohio 2001) (stating that among the considerations for determining whether a former spouse is an insider are "whether [they] . . . maintain any sort of business relationship together" and "the extent to which the parties' marital assets ... continue to be intertwined"); *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008 (5th Cir. 1992) (former wife was insider under Uniform Fraudulent Transfers Act).

*Wiswall v. Tanner (In re Tanner)*, 145 B.R. 672 (Bankr. W.D. Wash. 1992) is illustrative of the principle that a hostile ex-wife can still be an insider. In *Tanner*, the Debtor had an intimate relationship with Wiswall. She borrowed money from Wiswall, who later forced her out of their joint home. Wiswall used her dominance over the Debtor to cause her to convey her one-half interest in the home to Wiswall. The court found that, on the basis of such influence, Wiswall was an insider to the Debtor even though their romantic relationship had already ended.

Elizabeth is Denis' ex-wife and the mother of Denis' children, with the power to withhold from Denis their minor daughter's visitation rights, a power which she has threatened to use to her economic advantage in relation to the hotel.[289] She is an insider upon this basis as well.

### Breach of fiduciary duty

Even if Elizabeth and Eliezer were not insiders to Denis, their claims may be subordinated on the basis of specific wrongful conduct. A common type of misconduct is a breach of fiduciary duty.

Prior to the appointment of the state court receiver, Elizabeth and Denis always operated the hotel as a joint venture. A joint venture is identified by (a) an express or implied agreement to carry

---

[289] Direct Testimony of Denis Chira, ¶5. Elizabeth also had the power to set in train steps whose almost certain result would be (a) to have Denis incarcerated for nonpayment of child support and (b) to have a receiver appointed for their jointly owned business. However, the ability to obtain court orders does not, on its own, make a former spouse an insider. *Barnhill v. Vaudreuil (In re Busconi)*, 177 B.R. 153, 159 (Bankr. D. Mass. 1995).

on some enterprise; (b) a manifestation of intent by the parties to be associated as joint venturers; (c) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge by each joint venturer; (d) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (e) provision for the joint sharing of profits and losses. *Ely v. Shuman*, 233 So. 2d 169, 170 (Fla. 1970) (citing *Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957)); *Williams v. Obstfeld*, 314 F.3d 1270 (11th Cir. 2002) (adopting Florida state law standards). All of those characteristics are present in this case. Although Denis lost practical control of the business, he never agreed to cede his right to join in controlling the venture, except the cession of control contained in the global settlement agreement which was never performed by any of the parties and which Elizabeth, Lounge Corp. and the Trustee stipulate must now be set aside.

A joint venture relationship is similar to that of a partnership and is therefore governed by the principles controlling partnership law. *Soler v. Secondary Holdings, Inc.,* 832 So. 2d 893 (Fla. 3rd DCA 2002) (citing *Russell v. Thielen*, 82 So. 2d 143, 145 (Fla. 1955)).

Under the Revised Uniform Partnership Act, as adopted in Florida, a partner in a partnership owes fiduciary duties of loyalty and care. Fla. Stat. § 620.8404(1). A partner's duty of loyalty to the partnership and the other partners includes, without limitation, the following:

> (a) to account to the partnership and hold as Trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity; (b) to refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and (c) to refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

*Id.* The separate duty of care is not defined in the statute.

A partner shall discharge the duties to the partnership and the other partners under this act or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

Fla. Stat. §620.8404(4).

In this case, Elizabeth had a duty to do no harm to the joint venture, a duty to hold as trustee for the partnership any benefit that she derived from the partnership property, a duty not to usurp a partnership opportunity, and a duty not to deal with partnership property on behalf of one holding an adverse interest. She also had a duty of care in acting on behalf of the partnership. All of these duties were to be measured by an obligation of good faith and fair dealing.

Elizabeth violated her fiduciary duties of loyalty and care by the entire course of her conduct. She improperly removed Denis as a director of Lounge Corp. She misused Lounge Corp. in making a commercially unreasonable lease with Swim & Fun Wear for her benefit and to the detriment of Denis and in using the Swim & Fun Wear lease to attempt to shift the bulk of the value of the Property to herself. She refused to return to mediation in January 2001 as she had previously promised. She made a secret pact with her brother to use her funds to purchase the first mortgage when it was on the verge of (but not actually in) default, and to subject Denis thereby to five years of 18% interest and, through the vehicle of Eliezer's refusal to accelerate the mortgage debt, to accrue unjustified late charges. She unlawfully forced Denis to give her a consent judgment for $2,500,000, an amount grossly in excess of Denis' actual obligations to her. She engaged in a long series of unreasonable (and uniformly unsuccessful) objections, motions, and appeals, attacking either the City First second mortgage, the sale to Saal, or the Receiver and his counsel generally, causing the Receiver's and Receiver's counsel's fees to increase greatly. She rented out one of the

46

retail spaces in complete disregard of the receivership. She interfered with tenants' relationships with the Receiver. She refused the Receiver's demand that she pay rent or vacate her store despite Denis' having returned his store premises to the Receiver.

She has continued to make commercially unreasonable leases in order to depress the value of the Property to Mr. Saal, revealing that each new lease had a secret "buy-out" addendum only when forced to by the Trustee's discovery requests in this proceeding. She unnecessarily defended a valid wage overtime claim, causing a $15,000 claim to become a $70,000 settlement payment from Lounge Corp. She has falsely represented to another tenant and to the state court that Denis conveyed his title to her in March 2005. She has continued to draw a grossly excessive salary even though she has hired an experienced manager for the small hotel and pays him $800 per week to undertake all day-today functions of administration. She has withheld important documents in this case. She has failed to account for large sums of hotel income until the eve of trial. And she cannot account for where substantial funds reported as hotel revenues and as expenses by Lounge Corp.'s accountant appear in the company's financial records.[290]

Her underhanded conduct in impeding the sale of the Property has kept Denis in a position where he can't afford to move out of the hotel, and therefore he has continued for years to accrue charges for a hotel room averaging more than $2,000 per month, and to accrue the obligation to pay additional living expenses for his daughters which was supposed to end with the sale of the hotel under the terms of the 2000 mediation agreement, six years ago.

---

[290] *See, e.g.*, Trial Trans. 8/23/06, p. 336–37, 345–47.

47

Elizabeth's record of economic oppression of Denis is far more heinous than Denis' record of failing to pay child support.[291]    That said, I am required to establish an amount of damages suffered by Denis or his creditors.

A claim may be subordinated only to the extent necessary to offset the harm caused by the claimant to the Debtor and its creditors. *In re Mobile Steel,* 563 F.2d 692, 701 (5th Cir. 1977). In this case, taking into account the four settlements, the claims of creditors in this case are largely resolved. The claims, with interest on secured claims calculated through August 23, 2006, are presented below. The five claims highlighted in gray were unliquidated prior to the entry of this order.[292]

| No. | Claimant | Claim Amt | Type | Object | Comments | Allow Amt |
|-----|----------|-----------|------|--------|----------|-----------|
| | **Secured by Entire Property:** | | | | | |
| 11 | Broward Co. Dept. of Finance | $64,026.81 | P | Yes | a/o 8/2006 = $133,239 | 133,239.00 |
| 19 | Eliezer Botton | $1,525,183.22 | S | Yes | Excessive | 1,142,949.00 |
| | | | | | | |
| | **Secured by Denis' Half of the Property:** | | | | | |
| 16 | First Trust Corp. as Trustee | $1,230,664.66 | S | Yes | Settled – CP 223 | 832,444.11 / 19,500.00 |
| 8 | Barry G. Roderman & Associates, P.A. | $150,757.19 | S | No | Settled – CP 224 | 126,094.89 |
| 9 | Barry G. Roderman & Associates, P.A. | $90,823.53 | S | No | Settled – CP 224 | 86,523.31 |
| 7 | Superior Moving & Storage, Inc. | $4,908.67 | S | No | Allowed | 5,684.38 |
| 14 | Sheldon Hotel Lounge Corp. | $79,860.00 | S | Yes | Excessive | 34,500.00 |
| 15 | Nofal Kahook/Sheldon Beach Resorts Inc. | N/A | | Yes | Settled – CP 226 | 50,000.00 |
| | | | | | | |
| | **Priority Claims:** | | | | | |
| 13 | Elizabeth Chira | $4,555,215.45 | S,P,U | Yes | Excessive | 360,059.66 |
| 6 | Internal Revenue Service | $8,680.16 | P | Yes | Paid | 0.00 |
| | Barry G. Roderman & Associates, P.A. | | | | Ch 7 admin exp – CP 224 | 7,301.00 |

---

[291] I do not condone Denis' actions as an abusive and irresponsible husband. Those actions may well have provided a psychological justification to Elizabeth for her subsequent financial abuse of Denis and Denis' estate, but they do not provide a legal justification for her conduct.

[292] The sources of the information on this chart, part of which was incorporated into the Direct Testimony of Sonya Salkin, ¶3(d), are the proofs of claim and settlements filed in the Debtor's case. References to Court Papers ("CP's") are to docket entries in the Debtor's case.

48

| | General Unsecured Claims: | | | | | |
|---|---|---|---|---|---|---|
| 10 | Carter Schwartzreich & Yates | $4,000.00 | U | No | | 4,000.00 |
| 1 | Worldwide Asset Purchasing, LLC | $1,719.39 | U | No | | 1,719.39 |
| 12 | Florida Power & Light | $2,095.85 | U | Yes | Paid | 0.00 |
| 13 | Elizabeth Chira | see above | U | Yes | Excessive | 179,241.69 |
| 15 | Nofal Kahook/Sheldon Beach Resorts Inc. | N/A | | Yes | Settled – CP 226 | 40,000.00 |
| 17 | Tiffany Walker/Marika Tolz | $2,500,500.00 | U | Yes | Excessive | To be determined |
| 18 | Tiffany as PR for Est. of G. Walker | $15,000.00 | U | No | | 15,000.00 |

This chart does not take into account the possibility that Mr. Saal will have a massive claim, including possibly for consequential damages, if the Trustee ultimately rejects Mr. Saal's executory contract. This could happen in any of at least three ways, according to the Trustee's motion to assume executory contract which the court granted on June 5, 2006: (1) if Elizabeth is unsuccessful, in her appeal from the June 5 order, in establishing that the discharge of the state court receiver caused Mr. Saal's contract to become unenforceable, but is successful in her appeal in establishing that a Trustee may not avoid the effect of 11 U.S.C. §363(i) by assuming a prepetition sale contract; or (2) if this court declines to find that the Lounge Corp. lease is a sham; or (3) if this court rules that the estate must split the $2,000,000 premium 50/50 with Elizabeth. The latter two issues are resolved here.

I conclude, and equity dictates, that Elizabeth not receive half of the $2,000,000 premium offered by Saal to the estate in exchange for the court's approval of the assumption of the Saal contract. By its own terms, the addendum to the contract between the Trustee and Saal specifically provides that all of the extra funds would be paid to the estate. While that contractual term agreed to by Saal and the Trustee could be seen as self-serving by the Trustee, it remains the case that Elizabeth is unalterably opposed to the sale to Saal.[293] Since I have previously ruled[294] that the Saal contract *to which Elizabeth agreed in the prior divorce court litigation* remains a valid and

---

[293]She is opposed to that sale, of course, because she – and the other parties to the case – believe that the Property is worth considerably more in the market. Whether that belief is justified in light of recent slumps in the South Florida real estate market is open to question.
[294]*In re Chira,* 343 B.R. 361 (Bankr. S.D. Fla. 2006).

49

enforceable executory contract, Elizabeth would have been bound by the $5.85 million sale price but for the filing of the involuntary bankruptcy petition against Denis, which gave rise to the possibility that the contract could be rejected under 11 U.S.C. § 365.   The filing of the bankruptcy petition created a whole host of additional legal issues so that it was well worth Saal's while to offer an additional inducement to the Trustee, an inducement which Saal never would have had to offer if this bankruptcy case were not pending.  Simply stated, Elizabeth would have received no more than one-half of $5,850,000 for her ownership interest if the Saal sale had gone forward as mandated by the divorce court.   That is precisely what she will get for her half interest in the Property if the Saal sale closes.  Elizabeth is, of course, an indirect beneficiary of the additional consideration to be paid by Saal under the amended contract with the Trustee, since she is by far the largest unsecured creditor of Denis' estate.  Moreover, Elizabeth has done nothing to justify an enhancement of her position. To the contrary, her conduct as outlined above reflects a consistent and relentless effort to deprive Denis of his remaining equity in the Property by any and all means possible, including many which no court of equity could countenance.  Looked at from the perspective of her conduct, Elizabeth has accomplished one of her goals, that of punishing Denis: he is insolvent and will receive nothing from this estate for his interest in the Property.

Elizabeth is entitled to a § 507(a)(7)[295] priority claim in the sum of $360,059.66 and a general unsecured claim in the sum of $178,441.69.  However, those claim must be equitably subordinated pursuant to 11 U.S.C. § 510(c) to all other claims either allowed or to be allowed in this chapter 7 case, because the damages she has caused to Denis exceed the aggregate of her allowed claims, $538,501.35.  The effect of Elizabeth's misconduct is most readily seen in the damages suffered by

---

[295]  Seventh priority is established according to the law in effect at the time this bankruptcy case was commenced, on April 14, 2005.

Denis due to the delay in closing on the $5,850,000 sale. The direct damages are the difference between the amount of Denis' equity in the property at the time that Elizabeth's conduct became an unfair obstacle to the sale of the property and the amount of the estate's equity in the property today. The month-by-month backup data, which is attached to Exhibit 201, permits the court to attribute the dollar amount of the diminution in Denis' equity in the hotel to various causes. One cause is Denis' own attorney's fees, as to which there is insufficient information in the record to attribute any portion of them to Elizabeth's misconduct. Another cause is the Receiver's and Receiver's attorney's fees, for which the information available is the timing of the accrual of the fee awards, the record activity on the divorce court docket, and the various divorce court orders. I find that at least one half of the $375,000 in fees were attributable to Elizabeth's misconduct or to the delay in closing caused by her misconduct. I find that the delay in closing resulting from her misconduct began no later than February 2001, when she insisted on shifting $800,000 of value in a $4,850,000 contract to Swim & Fun Wear. On this basis, Elizabeth's $538,501.35 total claim is exceeded by the damages she caused to Denis' equity in the Property. Her entire claim shall be subordinated to all other creditors.[296]

Denis suffered consequential damages as well, such as one half of the loss in value of Lounge Corp. by virtue of Elizabeth's continuing to pay herself $2,000 per week for her long-distance[297] oversight of the hotel when she had a competent full time manager on site and by virtue of Elizabeth's choosing to defend a treble damages overtime suit for which her unsuccessful defense was that the company should not have to pay for damages left behind by a court-discharged Receiver. It is not necessary for the court to catalog the consequential damages, since Elizabeth's entire claim has

---

[296] The court might have considered subordinating Elizabeth's claim also to any interest Denis may have in a surplus estate, but under the terms of the Saal deal, as it stands today, there will be no surplus for Denis in any event, since Saal is to receive a rebate of whatever amount would otherwise constitute a surplus.

[297] Elizabeth was a resident of New York for most if not all of the relevant period.

subordinated.[298]

### Eliezer Botton's obligations

Ordinarily, Eliezer Botton would have had no fiduciary duty to the joint venture or to Denis as joint venturer. His interest, as a holder of a note and mortgage, was known to be adverse to the Property. "When the parties are dealing at arm's length,[299] a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other." *Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.,* 850 So. 2d 536, 541 (Fla. 5th DCA 2003); *Mac-Gray Services, Inc. v. DeGeorge,* 913 So. 2d 630, 633 (Fla. 4th DCA 2005) (neither seller nor broker had fiduciary duty to buyer of laundromat).

But fiduciary duties may be imputed by the course of conduct between the parties. *Maxwell v. First United Bank,* 782 So. 2d 931, 933 (Fla. 4th DCA 2001). When a fiduciary relationship is implied in law, it is based on the specific facts and circumstances surrounding the transaction and the relationship of the parties. *Id.* at 933. This can arise when "confidence is reposed by one party and a trust accepted by the other." *Id.* at 934 (citing *Capital Bank v. MVB Inc.,* 644 So. 2d 515, 518 (Fla. 3d DCA 1994) (quoting *Dale v. Jennings,* 90 Fla. 234, 107 So. 175, 179 (1925))). In this sense, breach of fiduciary duty is a broad theory of recovery which "can include conduct which is merely negligent but does not rise to a level of fraud." *Niles v. Mallardi,* 828 So. 2d 1076, 1078, n. 1 (Fla. 4th DCA 2002); *Horizons Rehabilitation, Inc. v. Health Care and Retirement Corp.,* 810 So. 2d 958, 964 (Fla. 5th DCA 2002) (a breach of fiduciary duty need not rise to the level of an intentional tort). "If a relation of trust and confidence exists between the parties (that is to say, where confidence is

---

[298]Calculating the consequential damages would merely increase the quantum of harm suffered by Denis' estate. Since that harm already exceeds Elizabeth's total claim, whereby that entire claim is to be subordinated, the additional calculation would be a waste of judicial labor.
[299]Of course, Eliezer did not deal with Elizabeth or the Property at arm's length.

reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (quoting *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927)).

District Judge Highsmith has commented that conduct which abuses a confidential relationship is actionable under the aegis of constructive fraud:

> Florida law recognizes an equitable cause of action for constructive fraud when a fiduciary or confidential relationship has been abused. *See First Union National Bank of Florida v. Whitener*, 715 So. 2d 979, 982 (Fla. 5th DCA 1998), review denied, 727 So. 2d 915 (Fla. 1999). In cases alleging corporate malfeasances this cause of action is often asserted in conjunction with the more familiar claims for breach of the fiduciary duty of care and breach of the fiduciary duty of loyalty. *See, e.g., Halkey-Roberts Corp. v. Mackal*, 641 So. 2d 445 (Fla. App. 1994).

*Banco Latino International v. Gomez Lopez*, 95 F. Supp. 2d 1327, 1335 n.9 (S.D. Fla. 2000).

> Constructive fraud is simply a term applied to a great variety of transactions ... which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. Pomeroy's Eq. Jur. (4th Ed.) § 992.

*Halkey-Roberts Corp. v. Mackal*, 641 So. 2d 445, 447 (Fla. 2d DCA 1994) (employee's unauthorized use of corporate funds), quoting *Douglas v. Ogle*, 80 Fla. 42, 85 So. 243, 244 (Fla. 1920).

Ordinarily, to establish a fiduciary or confidential relationship between the parties, there must be a showing of substantial evidence indicating dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party. *See Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991); *O'Halloran v. First Union National Bank of Florida*, 205 F. Supp. 2d 1296, 1301 (M.D. Fla. 2002), *aff'd* 350 F.3d 1197 (11th Cir. 2003). Moreover, evidence that one party placed trust or confidence in the other party does not create a fiduciary relationship in the absence of "some recognition, acceptance or undertaking of the duties of a fiduciary on the part

53

of the other party." *Lanz*, 764 F. Supp. at 179 (citing *Harris v. Zeuch*, 137 So. 135 (1931)); *Barnett Bank of West Florida v. Hooper*, 498 So. 2d 923 (Fla. 1986).

Courts have sometimes found a breach of fiduciary duty even among parties who are ostensibly dealing with one another at arm's length, such as the relationship between borrowers and lenders, "where the bank knows or has reason to know of the customer's trust and confidence under circumstances exceeding an ordinary "customer relationship, or where the customer is "relying on the bank so as to counsel and inform him" or in some cases where the lender takes on extras services for a customer, receives any greater economic benefit than from a typical transaction, or exercises extensive control. *Capital Bank v. MVB, Inc.,* 644 So. 2d 515, 519-521 (Fla. 3d DCA 1994), *rev. denied*, 654 So. 2d 918 (Fla. 1995) (bank took advantage of its knowledge of customer's weakness to pressure it to buy overvalued equipment from another bank customer); *Susan Fixel, Inc., v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 208 (Fla. 3d DCA 2003) (factor which orchestrated an agreement with third party by which borrower's finances suffered further decline may have breached fiduciary duty).

It is not necessary that the defendant have personally benefited from the breach. *Ft. Myers Development Corp. v. J.W. McWilliams Co.*, 122 So. 264, 268 (1929) (aiding and abetting a breach of fiduciary duty); *In re Koszuth*, 43 B.R. 104, 107 (Bankr. M.D. Fla.1984) (misappropriation of trust property); *In re Pieper*, 119 B.R. 837, 840 (Bankr. M.D. Fla.1990) (same, in dicta).

A breach of fiduciary duty can also form the basis for an independent tort of civil conspiracy. *Blatt v. Gree, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 951 (Fla. 3d DCA 1984) (attorney assisted personal representative in distributing estate in derogation of fiduciary duty to pay assigned share of estate to common-law wife); *Moecker v. Vehicle Safety Systems, Inc.,* 2000 U.S. Dist. LEXIS 21191

(M.D. Fla. 2001) (magistrate's recommendation adopted at 2001 U.S. Dist. LEXIS 12077). Civil conspiracy under Florida law requires a showing that two or more persons have taken concerted action to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. *Robinson v. L'Engle,* 13 Fla. 482 (1869); *Robinson v. State,* 610 So. 2d 1288 (Fla. 1992); *Segal v. Rhumbline International, Inc.,* 688 So.2d 397 (Fla. 4th DCA 1997). The basis for the conspiracy must be "an independent wrong or tort which would constitute a cause of action if the wrong were done by one person." *American Diversified Insurance Services v. Union Fidelity Life Insurance Co.,* 439 So. 2d 904, 906 (Fla. 2d DCA 1983); *Liappas v. Augoustis,* 47 So. 2d 582 (Fla. 1950); *Kee v. National Reserve Life Ins. Co.,* 918 F.2d 1538 (11th Cir. 1990).

> Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one.

Restatement of Torts (Second) § 876(a), comment. However, a civil conspiracy does not require more than knowledge and general participation in the conspiracy to commit a civil wrong. *Voll v. Randazzo,* 674 So. 2d 892 (Fla. 5th DCA 1996).

Eliezer Botton isn't a stranger who purchased a mortgage, becoming an arm's–length lender in the process. He is Elizabeth's brother. He was the friend of Denis who introduced Denis to Elizabeth thirty years before. He was the broker to whom Denis and Elizabeth gave the listing on the hotel,[300] reposing their confidence in him. However, rather than presenting a contract that treated Denis' and Elizabeth's interests equally, Eliezer procured a contract from Frida Koren in early 2001

---

[300]  Direct testimony of Eliezer Botton, ¶21.

that shifted $800,000 of the property's value to Elizabeth in consideration for the Swim & Fun Wear lease that Eliezer must have recognized as a scheme by Elizabeth to control the property at the expense of Denis.  Denis rejected the $800,000 shift in value.[301]

A few months later, at a time when Denis was known to be in financial distress – the second mortgage on his interest in the hotel having just gone into foreclosure and Denis having been held in contempt for his failure to pay child support to Elizabeth – Eliezer entered into separate negotiations, confidentially with Elizabeth, by which she would loan him $373,276.85 at 18% interest to purchase the first mortgage in Eliezer's name rather than keeping the loan current.  Through this charade, Eliezer meant to enable Elizabeth to collect back both her share and Denis' share of the property's debt service at the 18% default rate of interest.  To compound the harm to Denis and Elizabeth, Eliezer as the new mortgage holder improperly compounded the interest charged, creating the appearance of an encumbrance growing much faster than even the default clause of the mortgage note permitted.  Eliezer knew, of course, that Elizabeth had "hedged" her exposure by her secret arrangement with Eliezer that he would eventually pay to her the same 18% interest that he would collect from the property.

---

[301] *See* text at footnote 192, *supra.*



Eli Botton's and Elizabeth's Entitlement to 18% Interest:
Effect on Denis' Equity in Hotel

Above is a chart[302] prepared by the Trustee showing the effect of Eliezer's and Elizabeth's deal

on Denis' equity in the hotel, assuming a value of $5,850,000 and an interest rate of 18% on Eliezer's

---

[302]This chart is difficult to read in black and white but is accessible in color on the Court's website.

claim.[303]

The chart is designed to match the actual effect of the liens. Increases in the First Trust and Roderman judgments affect only Denis' one-half interest in the property, while the increases or decreases in Eliezer Botton's claim, real estate taxes, and receivership expenses, affect the entire property. The chart also reflects the effect of Eliezer's cupidity in taking numerous actions to bolster his investment in a manner that he knew would increasingly squeeze out Denis' equity. By paying off real estate taxes between April 29 and May 5, 2005, rather than leaving the tax certificate holders subject to the automatic stay, he increased the tax burden from rates ranging between 0.25% and 7% to a rate of 18%.[304] And by refusing the Receiver's offer of receiver's certificates, pre-authorized by the receivership court,[305] at 9% interest, Eliezer assured that he would convert $617,015 paid for receivership fees and expenses[306] into an 18% yield under the "preservation of collateral" clause in his mortgage.

---

[303] The figures upon which this chart is based appear in the plaintiff's Trial Exhibit 201 (Backup Data for chart "Denis Gets Squeezed"). Those figures are in turn derived from the following record. As to the amounts due to Eliezer, Trial Exhibit 88, Transcapital account history; Trial Exhibit 116, estoppel letter from Transcapital; and Direct Testimony of Sonya Salkin, ¶3(b). As to the amounts due to First Trust Corp., Trial Exhibit 54, Final Judgment, January 22, 2003, setting forth the accrual of prejudgment interest; Trustee's Motion to Approve Settlement with First Trust Corporation, August 18, 2006, in main chapter 7 case; Direct Testimony of Sonya Salkin, ¶3(c). As to the amounts due to Barry g. Roderman & Associates, Trial Exhibit 60, February 2003 judgment; Trial Exhibit 62, July 2004 judgment; Direct Testimony of Sonya Salkin, ¶3(c). As to the amounts due to the Broward County Tax Collector, Trial Exhibit 178, tax collector's certifications; Direct Testimony of Sonya Salkin, ¶3(a). As to the amounts due to the receiver and his counsel, the $375,000 is treated as having been incurred at an even rate of $9,615 per month for the 39 months between November 2001 and January 2005.

[304] *See* Trial Exhibit 178 (tax collector's certifications of real estate taxes for those taxes); Pretrial Order, ¶A(49) (listing taxes paid by Eliezer).

[305] *See* Trial Exhibit 74 (Order, November 21, 2001); Direct Testimony of Eliezer Botton, ¶17; Trial Trans. 8/22/06, p. 79, 80–81, 206–08.

[306] The receivership expenses, covering repairs, professional fees, and taxes, are listed in the Pretrial Order, ¶A(49), and are totaled in the Direct Testimony of Sonya Salkin, ¶3(b). Application of an 18% simple interest rate, rather than the contract rates (Wall Street Journal prime rate plus one percent) detailed in ¶3(b) of Ms. Salkin's testimony, would generate for Eliezer an extra $118,085 in interest above the contract rates, through August 23, 2006, on the $617,015 in receivership expenses, as well as an extra $198,333 in interest above the contract rates on the $348,631 principal balance of the mortgage.

During the trial, Eliezer conceded that he cannot charge compounded interest under the Family Bank note and mortgage. Nonetheless, it can be easily seen from the chart that, if Eliezer earns 18% simple interest, Denis' bankruptcy estate's equity in the property may be exhausted during the course of Elizabeth's appeals from the court's June 5, 2006 order and her likely appeals from this order.

By his actions, Eliezer conspired with Elizabeth to assist her in breaching her fiduciary duties to Denis, and Eliezer breached his own fiduciary duties that arose by virtue of the position of confidence he held as the Chiras' real estate broker, brother, and friend. On balance, the evidence shows that he also engaged in inherently unfair conduct by an insider, such as should subject his claim to subordination.

The court finds that Eliezer Botton's claim, though secured, should be subordinated to the claims of all other creditors, to the extent the interest portion of his claim exceeds the nondefault rate of interest on $348,631 in principal and $617,015 in receivership expenses, aggregating a principal balance of $965,646. The nondefault rates are set forth in the chart which is incorporated into ¶3(b) of the Direct Testimony of Sonya Salkin, and total $177,303 through August 23, 2006, thus aggregating $1,142,949 through that date and $205.03442 per day afterward.

Eliezer is not entitled to recover attorney's fees, as he is not the prevailing party in this action. The Trustee may file a motion to assess attorney's fees within 30 days from the entry of the judgment.

### Disregard of sham lease

Section 105(a) of the Bankruptcy Code, in providing that "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title," provides supplemental authority to the All Writs Statute, 28 U.S.C. § 1651, which has similar language. Together, the two statutes are the source of the bankruptcy court's equity jurisdiction. *See* H. Rep.

No. 95-595, 95th Cong., 1st Sess., 316 (1977). This jurisdiction is not permitted to be exercised in a way which conflicts with other statutes, but it is expected that courts will rely upon equity's "broad authority to modify creditor-Debtor relationships." *United States v. Energy Resources Co.,* 495 U.S. 545, 549 (1990).

> The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.

*Pepper v. Litton,* 308 U.S. 295, 304–05 (1939) (internal citations omitted).

Federal courts exercising their equity jurisdiction have repeatedly found that they may direct that a lease between insiders, the terms of which were never performed, be disregarded as a sham. *See Staats v. Butterworth Properties, Inc. (In re Humble),* 19 Fed. Appx. 198, 2001 WL 1006148 (6th Cir. 2001); *B&M Leasing Corp. v. United States,* 331 F.2d 592 (5th Cir. 1964); *United States v. Rockwell,* 677 F. Supp. 836 (W.D. Pa. 1988); *MCI Telecommunications v. O'Brien Marketing, Inc.,* 913 F. Supp. 1536 (S.D. Fla. 1995).

In *Bennett v. Hollingsworth (In re Hollingsworth),* 224 B.R. 822 (Bankr. M.D. Fla. 1998), the Debtor produced an assignment of his stock interest in an aircraft holding company, LexAir, to his future son-in-law, and a lease by which LexAir leased the aircraft back to the Debtor, the rental consisting of all operating costs. *Id.* at 826–27. The Debtor ignored the terms of the lease, but maintained possession of the aircraft and paid LexAir only $75 per hour of actual flight time. *Id.* Noting that the lease was commercially unreasonable, and that the Debtor received no consideration in exchange for his stock, Judge Paskay held that both transactions would be disregarded in favor of the true state of affairs, which was that the Debtor was the owner of LexAir's assets. *Id.* at 829.

60

In this case, the 1999 Business Lease entered into between the Chiras and Lounge Corp. was neither performed nor intended to be performed. The court finds that it was a sham intended to provide merely a property manager for the hotel,[307] that it needlessly clouds the title to the Property, and that it should be of no further effect after today.

Lounge Corp. is a mere instrumentality of the Chiras, initially intended to shield the Property and themselves from potential tort liability, and subsequently used by Elizabeth to defraud Denis and his estate. Under Florida law, the corporate veil can be pierced where there is a showing both of domination or control such as would make a company the alter ego of its parent and of other improper conduct. *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998), and *Mullin v. Dzikowski*, 257 B.R. 356 (S.D. Fla. 2000) (both citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984)). In the context of creditor actions, the rule is often stated as mere-instrumentality-plus-fraud: "…it must be shown not only that the wholly-owned subsidiary is a mere instrumentality of the parent corporation but also that the subsidiary was organized *or used* by the parent to mislead creditors or to perpetrate a fraud upon them." *USP Real Estate Investment Trust v. Discount Auto Parts, Inc.,* 570 So. 2d 386, 390 (Fla. 1st DCA 1990). [Emphasis added.]

Examples of improper conduct are where the corporation is in actuality the alter ego of the stockholders and was organized or after organization was employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not established in good faith or, in general, that property belonging to the corporation can be

---

[307] Trial Trans. 8/22/06, p. 172 (Testimony of Elizabeth Chira: Q. Why did you use a company at all? A. Because I had to get a corporation to run the property—not the property, sorry, let me rephrase, to run the hotel, because it was a hotel company.")

61

traced into the hands of the stockholders. *Walton v. Tomax Corporation,* 632 So. 2d 178 (Fla. 5th DCA 1994). The Fourth District Court of Appeal has given these examples: the use of a sham corporation to accomplish some ulterior purpose, evade some statute or to accomplish some fraud, or use of the corporation for fraudulent or misleading purposes, especially of creditors. *Steinhard v. Banks,* 511 So. 2d 336, 339 (Fla. 4th DCA 1987). The use of a shell subsidiary to hold a lease while the parent operated its business in the leased premises subjects the parent to liability under alter ego theory for the subsidiary's obligation to the landlord, where the subsidiary had no bank account, capital, or assets, and where the subsidiary executed the lease which provided that the tenant would "operate" an auto parts store in the premises. *USP Real Estate Investment Trust v. Discount Auto Parts, Inc.,* 570 So. 2d 386 (Fla. 1st DCA 1990). And a parent corporation must be held liable for its subsidiary's debt where the subsidiary had no bank account, no assets, no capital, and no employees, and the subsidiary had entered into the contract with the creditor knowing that it had no ability to perform the contract because all of its revenues are deposited directly to the parent's account. *Ocala Breeders' Sales Co. v. Hialeah, Inc.,* 735 So. 2d 542 (Fla. 3d DCA 1999).

This is not a creditor action. Nonetheless, the Court of Appeals for the Eleventh Circuit has held that a Trustee may bring an action, frequently called a Trustee's "reverse piercing" action, to draw the assets of the Debtor's mere instrumentality into the Debtor's estate. She may bring the action so long as piercing the corporate veil is an action available under state law in those circumstances to creditors generally. *In re Icarus Holding, LLC,* 391 F.3d 1315, 1321 (11th Cir. 2004). Some bankruptcy courts have even permitted substantive consolidation of Debtor corporations and non-Debtor corporations upon equitable grounds. *See, e.g., In re Lease-A-Fleet, Inc.,* 141 B.R. 869 (Bankr. E.D. Pa. 1992); *In re New Center Hospital,* 179 B.R. 848 (Bankr. E.D. Mich. 1994); *In*

re *Munford, Inc.,* 15 B.R. 390 (Bankr. N.D. Ga. 1990).

The court believes that it is unnecessary to conduct an analysis of whether Lounge Corp. should be substantively consolidated with Denis' estate, and that to do so might work an injustice on Elizabeth, who still owns one half of the corporate stock. The case law on piercing, and reverse piercing, the corporate veil is illustrative of the extent to which equity may be invoked by bankruptcy courts to assure an equitable result. It is sufficient for the purposes of equity that the Lounge Corp. lease be found to be of no further effect from this date forward.

Lounge Corp. has asserted a claim for $79,900 in rents not paid by Denis for the use of his room in the hotel, at a rate of $2,500 during the four in-season months and $2,000 for the out-of-season months. However, Elizabeth already has an award for rent Denis owed through December 31, 2003. For the 15 ½ months between January 1, 2004 and the bankruptcy petition date, April 14, 2005, $34,500 is owed to Lounge Corp. for Denis' room occupancy, and Lounge Corp.'s claim will be allowed in that amount.

A separate judgment will be entered in accordance with Fed. R. Bankr. P. 9021.

### ###

Copies to be furnished to:

Patrick Scott
Charles Throckmorton
Arthur Neiwirth
Jeffrey Kaiser
Jeffrey Berlowitz
David Cimo
Gregory Garno
Ivan Reich

I:\ORDERS\06-1264 Salkin-Chira.FF.wpd